[No. D040174. Fourth Dist., Div. One. May 13, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD ALLYSON WILLIAMS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, Rule 976.1, this opinion is certified for publication with the exception of part II.A.

**COUNSEL**

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gary W. Brozio and Douglas P. Danzig, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HUFFMAN, J.**—In this case we must determine the propriety of several jury instructions including those relevant to the issue of criminal liability for acts of an agent. In addition we must address the question of whether the aggravated white collar crime enhancement can be construed for ex post facto purposes as similar to a continuing offense in which it is appropriate to address conduct before and after the enactment of a statute increasing criminal penalties.

In the published portions of this opinion, we find no error in the jury instructions regarding agency principles. We also find application of the

increased punishment prescribed by the aggravated white collar crime enhancement in this case did not violate the ex post facto prohibitions of either the state or federal constitutions.

A jury convicted Donald Allyson Williams of 10 counts of grand theft (Pen. Code, § 487, subd. (a);[1] counts 1, 3, 5, 7, 9, 11, 13, 15, 17 & 19), and 10 counts of making false statements in connection with the sale of a security (Corp. Code, §§ 25401, 25540; counts 2, 4, 6, 8, 10, 12, 14, 16, 18 & 20). As to counts 1 and 2, the jury found true the special allegation of a loss exceeding $150,000 within the meaning of section 12022.6, subdivision (b). As to counts 5, 6, 7, 8, 13 and 14, the jury found true the special allegation of a loss exceeding $50,000 within the meaning of section 12022.6, subdivision (a). The jury also found true the sentencing enhancement that alleged Williams committed two or more related felonies, a material element of which is fraud or embezzlement, involving a pattern of related felony conduct that resulted in the taking of more than $500,000 within the meaning of section 186.11. The court sentenced Williams to prison for 15 years as follows: five years on count 2; consecutive one-year terms on counts 4, 6, 8, 10 and 12; and a consecutive five-year term for the section 186.11 finding. The court then stayed the one-year terms on counts 14, 16 and 18 (under the double-the-base-term limitation of § 1170.1), the two-year term on count 1, and the eight-month terms on counts 3, 5, 7, 9, 11, 13, 15, 17 and 19 (under § 654).

On appeal, Williams makes three arguments. First, he contends the court erred in instructing the jury with CALJIC 17.41.1 because it violated Williams's constitutional rights by deterring candor in jury deliberations. Second, he contends the court's instruction on "Agency and Agent" requires reversal because it eliminated the elements of control and knowledge from the jury's consideration under Corporations Code section 25401. Finally, he contends the application of the "aggravated white collar crime enhancement" (§ 186.11) to transactions that occurred before its enactment violates the ex post facto and due process clauses of the United States and California Constitutions. We reject Williams's arguments and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

We state the facts and reasonable inferences in the light favoring the People as the party prevailing at trial. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Williams owned three corporations: Southern California Mergers and Acquisitions (SCMA), Onyx Oil and Gas Management (Onyx), and Coastline Financial (Coastline). SCMA was a mineral acquisition company. By selling private promissory notes, SCMA was able to raise working capital in order to acquire oil and gas leases. SCMA would then assign the leases from SCMA to Onyx. Onyx then structured the oil and gas leases into limited partnerships with Onyx acting as the general partner. Coastline acted as their licensed financial brokerage. It was responsible for selling mutual funds, Onyx's limited partnerships and SCMA's promissory notes.

From 1993 to 1996, each of Williams's corporations played a different role in developing and executing what is known as a "Ponzi" scheme.[2] SCMA was responsible for acquiring oil and gas lease interests in oil and gas. Williams would determine which properties to acquire, set the prices for the lease interests, and sell them to Onyx, who would structure limited partnerships in the interests. Coastline was then responsible for selling the limited partnerships in the oil and gas lease interests and the SCMA promissory notes.

According to the testimony of previous Coastline brokers, Williams and his son, Brian Rogers, gave scripts to the employees, who used them to solicit investments. The brokers would use the scripts when cold calling customers from a list the management provided them. According to the testimony of former brokers, these lists consisted primarily of the names of retired people over the age of 50. Each of the scripts was tailored to sell the customer on one of the products (e.g., partnerships in the oil and gas leases or the SCMA promissory notes). The scripts contained standard sales pitches for each product and standard rebuttals for hesitant customers. They instructed the brokers to tell customers that the limited partnerships were for people seeking to preserve capital and tax-sheltered monthly income, and they were fully secured by AAA-rated U.S. government agency bonds. The broker would quote a rate of return and indicate that it was annual with monthly distributions. The script used for selling the SCMA promissory notes also assured customers that the notes were fully backed with U.S. government agency bonds. On some occasions, Williams and the other managers monitored the brokers through the use of "snooper" telephones where the supervisors could listen in on the brokers' conversations with clients. During some of these solicitations, the supervisors, including Williams, would get on the telephone and "close the deal."

---

[2] A Ponzi scheme is a fraudulent investment scheme where "[m]oney from the new investors is used directly to repay or pay interest to old investors, [usually] without any operation or revenue-producing activity other than the continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston." (Black's Law Dict. (7th ed. 1999) p. 1180, col. 2.)

In addition to the information provided on the scripts, much of the brokers' knowledge of the limited partnerships and promissory notes came from Coastline staff meetings. During these meetings, the brokers were given information regarding the status of the production in the oil and gas fields. The brokers received daily reassurances from Williams and other supervisors that things were going well in the oil and gas patches and that a number of them were producing. The brokers were also encouraged by Williams to "reload," which meant calling clients on the day they received distribution checks in order to persuade them to reinvest the money. The brokers believed that Coastline was selling limited partnerships in oil and gas wells that were backed by government securities, which would pay a certain rate of income to investors, and the investors would eventually get their money back plus some income.

After working for Coastline for some time, a few of the former brokers testified as to some "questionable" business practices they observed. One broker, Christopher Tate, testified he heard brokers calling banks to find out how much money customers had before soliciting them. He brought this information to the attention of Williams, but the practice continued. Another former broker, Eric Gorshe, testified that he saw some papers indicating that the potential for recovery of reserves on some of the oil and gas fields was nonexistent despite the reassurances he received from Williams. Gorshe questioned Williams about this and asked for proof of sales of oil and gas reserves, but he was refused the information. Williams assured another broker that the limited partnerships were backed by government bonds. The broker later discovered they were zero-coupon bonds that matured in 30 years.

The prosecution produced three experts to testify about the corporations' actions. The first expert was a petroleum engineer who testified as to the suitability of the fields Williams purchased for oil and gas production. He testified that the wells owned by Williams have a typical life of 10 to 20 years. Williams's wells, however, had originally been drilled in the 1970's, and only one of the sites had produced anything in the preceding 10 years.

The second expert was a former employee of the California Department of Corporations. He testified that neither SCMA nor any of the limited partnerships applied for or obtained permits from the Department of Corporations to sell their issuer-securities. The intent of the permit process is to provide safeguards for investors, and if there is a product involved, such as oil leases, the intent is to assure investors the leases are as represented. There are exemptions to the permit process, however, that have built-in substitute protections. Under the private placement exemption, no permit is required to sell issuer-securities if the seller and buyer have already established a preexisting personal or business relationship, or if the investor is sophisticated enough to understand the transaction. The sophistication analysis also

requires a broker to factor in the suitability of the investor in terms of his ability to absorb the particular type of risk. Even if an investor is sophisticated enough to qualify under the private placement exemption, there still must be an adequate amount of meaningful and understandable disclosure.

Here, the private placement memorandum and the statements of the brokers were the basis for disclosure. Under these circumstances, it was critical that Coastline's disclosure be complete and understandable, so as not to omit or misrepresent any material facts. The expert then opined that the limited partnership interests, the SCMA promissory notes and the investment contracts are among the most risky and speculative investments in the marketplace. These types of investments are not suitable for elderly investors, retired investors, investors on a fixed income, or investors looking for safety and security. He also opined that the private placement memorandum was meaningless and not understandable to the average investor. It was couched in legalistic terms and its language was dense and convoluted. In addition, the pro formas provided by the company, which projected a steady production of oil and gas, were wholly inconsistent with the operating history. Finally, the expert opined that the Coastline offering materials were fraudulent and there was no way to sanitize them.

The prosecution's next expert was a forensic accountant who examined the bank records of Williams and the three corporations in order to trace the money from certain investors and determine the flow of the funds between the different accounts. Despite tracing numerous investors' checks, the accountant found only one check reflecting deposits from the sale of oil and gas. She traced the path of investor checks and found that there were instances in which checks from new investors were used to pay old investors. This conclusion was confirmed by a former certified public accountant who had quit working for Williams because he thought Williams was selling additional investments in order to pay back the distributions that were promised to past investors.

The victims in this case were of similar backgrounds. The majority of them were elderly, ranging in age from 66 to 90 at the time of trial. Coastline brokers contacted most of them by telephone and solicited investments. None of the victims were told of the risky and speculative nature of the investments, and, in fact, a few of the investors indicated to the brokers the need for conservative and safe investments. Several of the investors testified that the customer agreements, which were filled out by the brokers, contained false information. Some of the victims testified that their net worth as indicated on the customer agreements far exceeded their actual net worth, and others testified that the agreements overstated their previous involvement in business and financial investments. In addition, a few of the victims stated

that they received neither a private placement memorandum nor other investment information from Coastline, or they received such information only after having sent their investment check. In fact, after receiving investment information, one victim told the broker she did not understand the materials, and in response the broker reassured her and told her to sign. After investing with Coastline, the victims received distribution checks for a period of time, but the amounts decreased and the distributions eventually stopped altogether. When investors finally tried to contact Coastline, they received no response.

II

DISCUSSION

A. *CALJIC No. 17.41.1*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *"Otherwise Cause"*

Williams was convicted of six counts of violating Corporations Code section 25401.[3] Before 1995, a violation of this section did not require "scienter," that is, guilty knowledge at the time the representation or omission occurs. (*People v. Johnson* (1989) 213 Cal.App.3d 1369 [262 Cal.Rptr. 366], disapproved by *People v. Simon* (1995) 9 Cal.4th 493, 522, fn. 18 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) In *People v. Simon, supra,* 9 Cal.4th 493, however, the California Supreme Court concluded that "knowledge of the falsity or misleading nature of a statement or of the materiality of an omission, or criminal negligence in failing to investigate and discover them, are elements of the criminal offense described in section 25401." (*Id.* at p. 522.) Here, Williams does not challenge the court's instruction defining a violation of Corporations Code section 25401. The court specifically instructed the jury on all the necessary elements required, including the scienter requirement, before a Corporations Code section 25401 violation could occur. Rather, the dispute revolves around the instructions that described Williams's criminal liability for the acts of his agents. He contends that the court's

---

\*See footnote, *ante,* page 735.

[3] Corporations Code section 25401 provides: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading."

instruction defining "Agency and Agent"[4] eliminated the elements of knowledge and control required for criminal liability under an agency theory or on an aider and abettor theory.

The relevant portion of the contested jury instruction reads as follows: "Where a principal directly authorizes or *otherwise causes a crime to be committed* through the instrumentality of an agent, the law holds the principal responsible for the acts of the agent as though he personally committed them." This part of the instruction Williams challenges appears to have been drawn directly from Witkin. (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 92, p. 146. ["One may be a principal, in the criminal law sense, where he directly authorizes or otherwise causes a crime to be committed through the instrumentality of an innocent agent"].) Williams contends that the above italicized language allowed the jury to convict him of violating Corporations Code section 25401 without finding that he had control over the employees, had knowledge of the material misrepresentations or omissions, and allowed the illegal practice to continue. We disagree.

Reading the above italicized language in isolation might allow for an overly expansive interpretation of criminal liability. Arguably, a jury could infer criminal liability based on a variety of circumstances regardless of Williams's knowledge and control of his agents. The circumstances under which a person may "otherwise cause" a result are numerous, many of which do not require knowledge or control. Therefore, there is some support for the

---

[4] Jury Instruction No. 1 was given by the court as follows:

"With respect to each count of the information, testimony and evidence of certain transactions and conversations between the alleged victims and employees of Coastline Financial, Southern California Mergers & Acquisitions, and Onyx Oil & Gas, and outside the presence of the defendant, Donald Williams, were admitted. You are not to consider for any purpose said testimony and evidence of such transactions and conversations outside the presence of the defendant unless you believe beyond a reasonable doubt that at the time and place such transactions and conversations took place, that the employees of Coastline Financial, Southern California Mergers & Acquisitions, and Onyx Oil & Gas were then and there acting as the agent of the principal. It is alleged that the principal in this case is the defendant, Donald Williams.

"The term 'agent' means one who acts for or in place of another by authority from the other. The declarations of an alleged agent standing alone are not competent to establish either the existence of the alleged agency or the scope and extent of the alleged agent's authority.

"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act in his behalf and subject to the principal's control. In the absence of the essential characteristic of the right to control, there is no agency.

"Where a principal directly authorizes or otherwise causes a crime to be committed through the instrumentality of an agent, the law holds the principal responsible for the acts of the agent as though he personally committed them."

proposition that "otherwise cause," read in isolation, improperly exposes Williams to criminal liability for the acts of his agents. This reading, however, is taken out of context. Williams's position does not consider the modifying language around the phrase, nor does he take into account the additional instructions given by the court in connection with the challenged instruction.

The "otherwise cause" phrase cannot be interpreted without considering the modifying language within the given instruction. First, the phrase is juxtaposed with another phrase that allows for criminal liability on behalf of an agent who "directly authorizes" the prohibited conduct. A principal who directly authorizes certain conduct clearly has the knowledge of such conduct and the control to permit or prohibit the continuation of the agent's actions. It would be an unreasonable construction of the sentence to interpret the "otherwise cause" phrase in the abstract, and thus ignore the knowledge and control elements present in the language preceding it. A reasonable juror would surely understand the "directly authorizes" language as modifying and providing context to the challenged phrase.

■ The instruction interpreted in its entirety provides further context to the "otherwise causes" phrase. In two preceding paragraphs, the instruction specifically states that "the term 'agent' means one who acts for or in place of another by authority from the other. . . . [¶] Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act. The principal must in some manner indicate that the agent is to act for him and the agent must act or agree to act in his behalf and subject to the principal's control. In the absence of the essential characteristic of control, there is no agency." The court instructed that the existence of control by Williams was a prerequisite finding to the conclusion that an agency relationship existed. Therefore, the principal can "cause" a crime to be committed through an innocent agent only if the principal is "in a position to *control* the activities of [the agents]." (*People v. Conway* (1974) 42 Cal.App.3d 875, 886 [117 Cal.Rptr. 251].) The court properly instructed the jury on the element of control, and the jury implicitly determined Williams had control over the brokers if it found an agency relationship existed.

Even assuming the "otherwise cause" language was deficient, the court's instruction on aider and abetter liability, which immediately preceded the agency instruction, adequately informed the jury of Williams's liability for the acts of his brokers. CALJIC No. 3.01 (Aiding and Abetting—Defined) specifically discusses the type of knowledge, intent and action required for criminal liability under an aider or abettor theory. Considering the proximity of the two instructions, it would not be unreasonable for a juror to construe

the "otherwise cause" language in the agency instructions as referring to the aider and abettor theory of liability.

Considered in their totality, the court's instructions were adequate to inform the jury of the elements required under agency liability. " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197].) Williams's argument ignores this method of construction and isolates two words from the entire volume of instructions given by the court. Abstracting such specific language from its surrounding language always changes its content. It does not provide adequate context or other modifying language that supplements its meaning. Engaging in this type of interpretation is unreasonable, and thus no reasonable jury would confine its understanding of voluminous instructions to just two words.

## C. *The Aggravated White Collar Crime Enhancement*

Williams was convicted of 10 counts of making false statements in connection with the sale of securities and 10 counts of grand theft. The jury also found true the special allegation charged under section 186.11, known as the "aggravated white collar crime enhancement." This enhancement, which became effective January 1, 1996, provided for an additional term of imprisonment of two, three or five years for anyone convicted of two or more related felonies, a material element of which is fraud or embezzlement, involving a pattern of related felony conduct that results in the taking of more than $500,000.[5] The jury's finding included transactions that occurred between July 21, 1993 and December 13, 1996. The transactions that occurred

---

[5] As enacted in 1996, section 186.11, subdivision (a), stated in relevant part: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of more than five hundred thousand dollars ($500,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison for two, three, or five years. This enhancement shall be known as the aggravated white collar crime enhancement. The aggravated white collar crime enhancement shall only be imposed once in a single criminal proceeding. For purposes of this section, 'pattern of felony related conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events. For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions." (§ 186.11 was subsequently repealed by Stats. 1996, ch. 431, § 1 and a new § 186.11 was added by Stats. 1996, ch. 431, § 2.) The new section 186.11 provides for an aggravated white collar crime enhancement of one or two years when the combined taking involves more than $100,000, but less than $500,000. (§ 186.11, subd. (a)(1), (3).) When the combined taking is over $500,000, the choice of the length of the

after section 186.11 was enacted, however, totaled only $315,000, an amount insufficient to sustain a true finding of the enhancement.[6] Therefore, Williams contends the application of the aggravated white collar crime enhancement to the transactions which occurred before January 1, 1996, violates the ex post facto and due process clauses of the United States and California Constitutions. (U.S. Const., art. I, § 9; U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 9.) We disagree.

■ Ex post facto laws are prohibited under the federal and California Constitutions. (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9.)[7] Such provisions were intended to prevent legislatures from retroactively altering the definition of a crime or increasing the punishment for criminal acts. (*Collins v. Youngblood* (1990) 497 U.S. 37, 43 [111 L.Ed.2d 30, 110 S.Ct. 2715].) In short, "any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." (*Beazell v. Ohio* (1925) 269 U.S. 167, 169–170 [70 L.Ed. 216, 46 S.Ct. 68], italics omitted.) Here, we are concerned with the *Beazell* category that prohibits laws that subject a person after the fact to greater punishment for a criminal act than was possible at the time of its commission. Williams argues that the application of the relevant aggravated white collar crime enhancement constitutes this sort of ex post facto violation.

The factual basis supporting the special allegation arises from transactions that occurred during the years 1992 through 1996. The transactions that occurred after the enactment of section 186.11 are not of consequence because, as to those specific transactions, no ex post facto violation is implicated. The transactions occurring before 1996, which were accumulated with the rest of the takings to provide the factual basis for a true finding of the special allegation, are of consequence because without adding the amounts taken from these transactions the accumulated total does not equal $500,000, the minimum amount to satisfy a then section 186.11 violation.

possible enhancement is the same as originally enacted. (§ 186.11, subd. (a)(1), (2).)

[6] The following transactions occurred after January 1, 1996: (1) Mary and Joseph Campanella invested $85,000 in January 1996 and $100,000 in August 1996; (2) Emma Wilson invested $10,000 in September 1996; (3) Richard and Katherine Lyman invested $20,000 in January 1996 and $50,000 in June 1996; (4) James and Richard Lyman invested $10,000 in December 1996; (5) Doris Repa invested $15,000 in January 1996; (6) Grace Bolton invested $15,000 in January 1996; (7) Frank Storey invested $5,000 in August 1996, and $5,000 in December 1996.

[7] " '[N]either the language nor the history of the state ex post facto clause supports a different interpretation' from that accorded the cognate federal constitutional provision." (*People v. Arafiles* (1992) 6 Cal.App.4th 1467, 1482, fn. 4 [8 Cal.Rptr.2d 492], quoting *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 295 [279 Cal.Rptr. 592, 807 P.2d 434].)

Williams argues, therefore, that the application of the aggravated white collar crime enhancement to transactions that occurred before 1996 is retroactive and prohibited as an ex post facto violation.

Until the Legislature's enactment of section 186.11 in 1996, section 12022.6 provided the sole basis for enhancing sentences based on fraudulent activity that resulted in a large amount of takings. This allegation, however, only deals with takings that provide the factual basis for one violation. The Legislature had not created a means by which punishment could be based upon the accumulation of the total takings caused by a pattern of fraudulent felony activity. The purpose of the aggravated white collar crime enhancement was to provide a mechanism for greater punishment for criminals who engage in a pattern of fraudulent activity that results in a large amount of accumulated takings. This section increased the punishment for a continuing course of fraudulent conduct by providing for a two-, three-, or five-year sentence enhancement based on the accumulation of the total takings stemming from the fraudulent activity. As we shall explain, the increased punishment provided under section 186.11 is not retroactive with respect to Williams's fraudulent conduct that began before, but continued after, the statute's enactment.

"In general, application of a law is retroactive only if it attaches new legal consequences to, or increases a party's liability for, an event, transaction, or conduct that was *completed* before the law's effective date. [Citations.] Thus, the critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date." (*People v. Grant* (1999) 20 Cal.4th 150, 157 [83 Cal.Rptr.2d 295, 973 P.2d 72].) If the course of conduct necessary to constitute the offense spans the period of time before and after the law's enactment and the last act necessary to trigger the application of the law was committed after the law's effective date, then the application of that law is not retroactive, and hence, not a violation of ex post facto prohibitions. (*Id.* at p. 158.) The application of a newly enacted law to a crime that started before the enactment date and continues after the law becomes effective does not violate the prohibition against ex post facto laws. (*Id.* at p. 159.) The crimes that span the period before and after the enactment date are termed "straddle" offenses. (*Ibid.*)

Here, the trial court instructed the jury that a true finding of the section 186.11 special allegation required the determination that: (1) Williams committed two or more related felonies, a material element of which was fraud or embezzlement that involved a pattern of related felony conduct; (2) Williams took more than $500,000; and (3) the money unlawfully taken was either (a) pursuant to separate and distinct offenses on or after January 1, 1996, or (b)

pursuant to one or more transactions motivated by one common scheme or plan, as a single offense or crime, with the last transaction or purchase on or after January 1, 1996. In order to find this special allegation true, the jury must have concluded that Williams's actions were a part of one common scheme. This is the only possible explanation; the jury could not have reached such a finding based on offenses occurring on or after January 1, 1996, because the total takings at that time did not add up to $500,000. The jury implicitly found, therefore, that the transactions were motivated by one common scheme or plan, with the last transaction occurring after January 1, 1996, thereby allowing accumulation of the multiple thefts into a single course of conduct that totaled more than $500,000. The facts substantially support this conclusion.

The record describes a so-called in-depth "Ponzi" scheme, whereby brokers who were trained, supervised and directed by Williams solicited investments from new investors based on misrepresentations. The investment capital was then transferred from bank account to bank account and used to pay out distributions to investors. This evidence clearly shows Williams's sole purpose was to fraudulently extract as much money as possible from elderly investors while temporarily appeasing them with small distributions, only to refuse further payments after an optimal amount of money was extracted. Williams's purpose to defraud multiple investors through a common scheme is consistent with an enhancement that would accumulate the series of takings to provide for increased punishment.

The prohibition of ex post facto laws serves two primary purposes: (1) it assures that individuals get fair warning of a statute's effect and permits them to rely on its meaning until explicitly changed; and (2) it prevents the government from creating arbitrary and potentially vindictive legislation. (*Weaver v. Graham* (1981) 450 U.S. 24, 28–29 [67 L.Ed.2d 17, 101 S.Ct. 960].) Here, Williams's concern is that application of the sentencing enhancement did not provide him with fair warning of the possible sentence exposure that could result from his criminal actions. This concern is unfounded.

In 1996, when section 186.11 was enacted, Williams's brokerage firm had already solicited investments from several victims. If the brokerage firm had stopped inducing investments at that point, Williams's exposure to criminal charges would have been limited to the time preceding the statute's enactment. After the enactment of the aggravated white collar crime enhancement, however, anyone who had "engaged in the prohibited activities before the effective date of the legislation [was] on prior notice that only one further act may trigger the increased penalties and new remedies . . . ." (*U.S. v. Campanale* (9th Cir. 1975) 518 F.2d 352, 364.) Once Williams continued to defraud investors after the enactment date, he was on fair notice of the

possible consequences associated with section 186.11. This section gave fair warning of the punishment associated with Williams's criminal acts, and rather than heed the warning, he continued his scheme and accumulated enough takings to trigger the aggravated white collar crime enhancement. After ignoring such a warning and having continued his predatory scheme after the effective date of the enhanced penalties, Williams should not be allowed to take refuge under ex post facto protections.

■ For these reasons, we conclude that Williams's increased sentence based on the then applicable aggravated white collar crime enhancement did not violate the federal and state constitutional provisions against ex post facto laws.

## DISPOSITION

The judgment is affirmed.

Haller, J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 18, 2004. Chin, J., did not participate therein.