Filed 5/26/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| JUAN HJ DOE et al., | B264947 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC561238) |
| v. | |
| THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES et al., | |
| Defendants and Respondents. | |


APPEAL from an order of the Superior Court of Los Angeles County. Teresa Sanchez-Gordon, Judge.  Reversed and remanded.

Anthony M. De Marco for Plaintiffs and Appellants.

McKool Smith Hennigan, J. Michael Hennigan and Lee W. Potts, for Defendants and Respondents.


\* \* \*

A monsignor in the Catholic church allegedly molested two teenage boys in the late 1970's and early 1980's; while doing so, he allegedly lavished them with meals, clothes, travel and money. The victims, now both men in their 50's, sued the Archdiocese for damages in 2014. Insurance Code section 11583 tolls the statute of limitations period once a "person" makes an "advance payment or partial payment of damages" unless he notifies the recipient of the applicable statute of limitations period or until the recipient hires a lawyer. (§ 11583.)[1] Did the monsignor's contemporaneous gifts amount to such an "advance payment or partial payment of damages?" We conclude that they did not, to the extent those gifts were not solely to compensate for past sexual abuse but were also to facilitate criminal conduct such as "grooming" the boys for further sexual abuse or encouraging the boys not to report the past abuse they suffered. Because the victims' civil complaint alleges that the monsignor's contemporaneous gifts were for criminal as well as compensatory purposes, the trial court properly sustained the demurrer. We nevertheless remand to give plaintiffs the opportunity to amend their complaint to allege whether there were any solely compensatory payments made while the statute of limitations period had yet to expire.

## FACTS AND PROCEDURAL HISTORY

### I.    Facts

We draw the following recitation of facts from the operative first amended complaint (FAC).

Plaintiff Juan HJ Doe (J. Doe) was born in 1962 or 1963, and plaintiff Juan HL Doe (L. Doe) was born in 1964. Monsignor Benjamin Hawkes sexually abused J. Doe between 1976 and 1981; he sexually abused L. Doe between 1978 and 1984 or 1985. The abuse of J. Doe started when he was 13 or 14 years old, and ended when he was 18 or 19; the abuse of L. Doe started when he was 14 years old, and ended when he was 20

---

[1]    Unless otherwise indicated, all further statutory references are to the Insurance Code.

or 21. Hawkes died in 1985. From "shortly after he began grooming and molesting" J. Doe and L. Doe until an unspecified time prior to his death in 1985, Hawkes "[p]aid for lavish meals, clothes and entertainment" for both young men; "[p]aid for [them] to go on trips"; "paid for the private school education of [J. Doe]"; and gave each thousands of dollars in cash. "While Hawkes was paying [J. Doe and L. Doe] and providing for them, he communicated in words and deeds that the compensation he was providing them was for the abuse that he was committing upon them, and that by providing for [them] in this manner Hawkes believe he owned [them]. Hawkes intended these payments . . . to be partial compensation [for] his sexual abuse of them."

While this abuse was occurring, Hawkes "ran" defendant Roman Catholic Archbishop of Los Angeles (the Archdiocese). He acted pursuant to a power of attorney that granted him "'full power and authority to do and perform all and every act and thing whatsoever requisite, necessary or appropriate to be done'" and "'ratif[ied] all that [he] shall lawfully do or cause to be done.'" Hawkes used his "authority" "to conduct any and all transactions that had a monetary cost" to become "the managing agent for all financial affairs of the" Archdiocese and to "control[] the finances of the" Archdiocese.

In 1996, J. Doe contacted the Archdiocese and reported the abuse Hawkes had inflicted upon him. The Archdiocese paid for psychological counseling.

In 2014, J. Doe and L. Doe retained a lawyer.

## II. Procedural History

On October 21, 2014, J. Doe and L. Doe (collectively, plaintiffs) sued the Archdiocese civilly for damages. In the FAC, they sought to recover on theories of (1) child sexual abuse and (2) negligence. The Archdiocese demurred on the ground that the complaint, filed approximately 30 years after the abuse ended, was untimely.

After entertaining briefing, the trial court sustained the demurrer without leave to amend and dismissed plaintiffs' complaint. The court reasoned that the statute of limitations on plaintiffs' claims expired when they turned 26 in the mid-1980's, and the plaintiffs never filed a lawsuit during the one-year window in 2003 when the Legislature revived the expired claims of child abuse victims. The court further found that Hawkes'

gifts to the plaintiffs did not trigger the tolling provisions of section 11583 because "Hawkes was not acting on behalf of the Archdiocese when he provided compensation to plaintiffs while demanding sexual contact with them in order to . . . 'own them,'" so his payments did not toll the limitations period *as to the Archdiocese*. The court lastly concluded that the Archdiocese's payment for J. Doe's counseling in 1996 came after the limitations period had expired and did not revive it.

Plaintiffs timely appeal.[2]

## DISCUSSION

Plaintiffs argue that the trial court erred in sustaining a demurrer to the FAC without leave to amend. A demurrer may be sustained on statute of limitations grounds if the time bar "'"'clearly and affirmatively appear[s] on the face of the complaint.'"'" (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232, quoting *Committee for Green Foothills v. Santa Clara Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; Code Civ. Proc., § 430.30, subd. (a) ["when any ground for objection to a complaint . . . appears on the face thereof, . . . the objection on the ground may be taken by a demurrer to the pleading"].) We must accept as true all "well-pleaded facts" in the complaint, but need not accept allegations containing "legal conclusions," "adjectival descriptions" or "unsupported speculation." (*Ellis v. County of Calaveras* (2016) 245 Cal.App.4th 64, 70; *Chicago Title Ins. Co. v. Western Financial Corp.* (1968) 69 Cal.2d 305, 327.) Because "[t]he application of the statute of limitations on undisputed facts is a purely legal question," our review is de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 (*Aryeh*).) Further, because we are reviewing the trial court's ruling and not its reasoning, we may

---

[2] The notice of appeal filed by J. Doe and L. Joe listed the correct case number and explained that plaintiffs were appealing from a "[j]udgment of dismissal after an order sustaining a demurrer." Although the notice did not also list the *date* of the judgments, there was only one set of judgments of dismissal under this case number. Because the Archdiocese "'could not possibly have been misled or prejudiced'" by the omission of the date, we deny the Archdiocese's motion to dismiss the appeal on this ground. (*Geffckren v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1307.)

4

affirm on any ground supported by the record regardless of whether the trial court relied upon it. (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 201.) In deciding whether a plaintiff whose complaint is barred should be granted further leave to amend, we ask "whether there is a reasonable possibility that the defect can be cured by amendment"; if so, the trial court has abused its discretion in denying leave to amend and we must reverse. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 (*Zelig*).)

## I.     Was the Demurrer Properly Sustained?

As pertinent here, a statute of limitations gives someone who has suffered a civil wrong a certain period of time to sue for damages. (*Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1341 (*Gilkyson*); Code Civ. Proc., §§ 312 & 350.) Our Legislature fixes the time period, and that period is designed to strike a balance between the interest in giving a plaintiff sufficient time to sue against the interests in "'promot[ing] the diligent assertion of [the] claim[], ensur[ing] defendants the opportunity to collect evidence while still fresh, and provid[ing] repose and protection from dilatory suits once excess time has passed.'" (*Gilkyson*, at p. 1341, quoting *Aryeh*, *supra*, 55 Cal.4th at p. 1191.)

The time period starts to run once the cause of action "accrues." (*Gilkyson*, *supra*, 244 Cal.App.4th at p. 1341.) Although a cause of action typically "accrues" "'when [it] is complete with all of its elements'" (*Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797), a cause of action will at times be deemed to accrue at a later date, such as when the plaintiff did not discover and had no occasion to discover the cause of action until that later date, when the defendant fraudulently concealed the existence of a possible claim until that later date, or when the defendant committed multiple wrongs that ended on that later date. (*Aryeh*, *supra*, 55 Cal.4th at p. 1192.)

If the time between the date of accrual and the date the plaintiff files suit is greater than the time period prescribed by our Legislature, the plaintiff's claim is barred unless he can show that (1) the running of the time period was "tolled" (that is, the time period's "clock" was "stopped") and the total amount of untolled time is less than the legislatively-prescribed time period (e.g., *Pearson Dental Supplies, Inc. v. Superior Court*

(2010) 48 Cal.4th 665, 674), or (2) our Legislature later "revived" the barred claim by expressly declaring that persons with expired claims can once again sue (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 955 (*Quarry*)).

In evaluating whether plaintiffs' 2014 lawsuit for the sexual abuse they suffered in the late 1970's and early 1980's is timely, we must therefore ask two questions: (1) are plaintiffs' claims timely under the legislatively prescribed time period for bringing them?; and, if not, (2) was the limitations period tolled or their expired claims otherwise revived?

### A.      *Are plaintiffs' claims timely?*

To assess whether plaintiffs' claims were brought within the applicable time period, we need to know (1) when they accrued, and (2) what the applicable time period is.

Generally, "[a] cause of action for childhood sexual molestation accrues at the time of molestation." (*Shirk v. Vista Unified School Dist.* (2007) 42 Cal.4th 201, 210.) Where the molestation continues over a period of time, "accrual is measured from the date of the last molestation." (*K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1239.) In this case, J. Doe was last molested in 1981 and L. Doe was last molested in 1984 or 1985. Plaintiffs have alleged no basis to postpone those accrual dates.

Fixing the applicable time period is more complicated. That is because the limitations period for child sexual abuse has changed a lot over the last several decades. What matters is not what the limitations period is *now* (Code Civ. Proc., § 340.1),[3] but

---

[3]      Under current law, a child sexual abuse victim may sue a third party (that is, someone other than the perpetrator of the abuse) at any time before the victim's 26th birthday. (Code Civ. Proc., § 340.1, subds. (a)(2), (a)(3) & (b)(1).) If the third party "knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by any employee, volunteer, representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person," then the victim may sue "within three years

what it was at the time the plaintiffs' claims against the Archdiocese accrued. We focus on the statute in effect at the time of accrual because subsequent amendments to the limitations period, like all statutory amendments, are presumptively prospective in effect. (Code Civ. Proc., § 3.) The only time a court will apply a limitations period enacted after the underlying wrong occurs is when the pre-amendment limitations period has not yet expired (because, in that situation, the plaintiff's claim is still viable and the new limitations period is not being applied retroactively) or, as noted above, when the Legislature "expressly" declares its intent to revive expired claims. (*Quarry*, *supra*, 53 Cal.4th at pp. 955-956; *Doe v. Doe 1* (2012) 208 Cal.App.4th 1185, 1194-1195 (*Doe 1*); see also *Andonagui v. May Dept. Stores Co.* (2005) 128 Cal.App.4th 435, 441-442.) In 1981 and in 1985, victims of childhood sexual abuse had to file suit (1) within one year of the date the abuse ended, or (2) if they were under the age of 18 at that time, within one year of their 18th birthday. (Former Code Civ. Proc., § 340, par. (3), as amended by stats. 1973, ch. 20, p. 32, § 1; former § 340, par. (3), as amended by Stats. 1982, ch. 517, § 97, p. 2334; § 352, subd. (a); *Quarry*, at pp. 960-961.)

This case present an unusual wrinkle because the alleged abuse occurred before and after J. Doe's and L. Doe's age of majority. J. Doe turned 18 in 1980 or 1981, L. Doe turned 18 in 1982; at that time, they ceased being the victims of *childhood* sexual abuse (see Code Civ. Proc., § 340.1, subd. (e) [defining "childhood sexual abuse" as an "act . . . that occurred when the plaintiff was under the age of 18"]) and started being the adult victims of assault, battery and unlawful injury. We need not decide whether we must evaluate the accrual of plaintiffs' childhood sexual abuse claims separately from the accrual of their assault, battery and wrongful injury claims or whether the "continuing violation" doctrine serves to postpone the date of accrual for *both* types of claims until the continual abuse stopped. (Accord, *Aryeh*, *supra*, 55 Cal.4th at p. 1198 ["(a)llegations

_____

of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual abuse," even if that date is after the victim's 26th birthday (*id.*, subds. (a) & (b)(2)).

7

of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period"].)  This question is not squarely presented here because our conclusion is the same no matter how it is resolved:  The limitations period for J. Doe's childhood sexual abuse claim expired in 1981 or 1982, and for his assault, battery or unlawful injury claim—which is subject to a one-year limitations period starting at the conclusion of the abuse (former § 340, subd. (3), as amended by Stats. 1973, ch. 20, § 1, p. 32; former § 340, subd. (3) as amended by Stats. 1982, ch. 517, § 97, p. 2334)—expired in 1982; the limitations period for L. Doe's childhood sexual abuse claim expired in 1983 and for his assault, battery and wrongful injury claim expired in 1986.  Even if we postponed the accrual of J. Doe's and L. Doe's childhood sexual abuse claims until the adult abuse they suffered stopped, the limitations period for J. Doe's claims still expired in 1982, and L. Doe's in 1986.

Because plaintiffs did not bring suit until 2014, their claims were filed more than one year after the end of their childhood abuse *and* one year after the end of their adulthood abuse; their claims are consequently untimely under any scenario absent tolling or revival.

### B.  *Were plaintiffs' claims tolled or revived?*

#### 1.  **Were plaintiffs' claims tolled under section 11583?**

Section 11583 provides that any "advance payment or partial payment of damages made by any person" (1) may not "be construed as an admission of liability," and (2) shall be credited against any final settlement or judgment.  However, if the person making that "advance payment or partial payment of damages" does not give the recipient written notice of the applicable statute of limitations, the statute will be tolled until written notice is given or until the person retains an attorney, whichever happens

first.  (*Ibid.*)[4]  This section seeks to walk the line between two competing goals: "[E]ncourag[ing] early payments on prima facie meritorious claims while at the same time avoiding the risk that such early payments would lull a claimant into a sense of complacency about filing a lawsuit because of the apparent cooperativeness of the defendant." (*Evans v. Dayton Hudson Corp.* (1991) 234 Cal.App.3d 49, 54 (*Evans*); *Blevin v. Coastal Surgical Institute* (2015) 232 Cal.App.4th 1321, 1325-1326 (*Blevin*); *Doe 1*, *supra*, 208 Cal.App.4th at p. 1191.)  Although this provision is entitled "Motor vehicle insurance; Advance or partial payment of damages" and is located in the Insurance Code, it applies in child sexual abuse cases. (*Doe 1*, at pp. 1194-1195; *Doe v. San Diego-Imperial Council* (2015) 239 Cal.App.4th 81, 91 (*San Diego-Imperial Council*).)

In this case, Hawkes and/or the Archdiocese allegedly provided both plaintiffs money and gifts from the time their molestation began until an unspecified time prior to Hawkes's death in 1985, and provided J. Doe with psychological counseling in 1996. Because neither Hawkes nor the Archdiocese provided plaintiffs with written notice of the limitations period for sexual abuse claims, the applicability of section 11583 turns on (1) whether the money and gifts given contemporaneously with the sexual abuse, and the counseling provided in 1996, constituted the "advance payment or partial payment of

---

[4]      In pertinent part, the statute provides:  "[n]o advance payment or partial payment of damages made by any person . . . shall be construed as an admission of liability by the person claimed against . . .  Any such payments shall, however, constitute a credit and be deductible from any final settlement made or judgment rendered . . . which does not expressly take into account such advance payments.  Any person . . . who makes such an advance or partial payment, shall at the time of beginning payment, notify the recipient thereof in writing of the statute of limitations applicable to the cause of action which such recipient may bring against such person as a result of such injury or death . . .  Failure to provide such written notice shall operate to toll any such applicable statute of limitations or time limitations from the time of such advance or partial payment until such written notice is actually given.  That notification shall not be required if the recipient is represented by an attorney."

damages," and (2) whether, as to the money and gifts provided by Hawkes, those payments were made *by the Archdiocese* rather than Hawkes in his personal capacity.

### a. Are the money and gifts contemporaneous with the sexual abuse, or the psychological counseling provided to J Doe in 1996, "advance payment or partial payment of damages?"

In determining the meaning of the phrase "advance payment or partial payment of damages," we are construing section 11583. In so doing, we start with the text, and if that text is unambiguous and consistent with our Legislature's apparent intent, we look no further. (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1237 (*California Charter Schools Assn.*).) However, if the text is ambiguous or contrary to the Legislature's apparent purpose, we may look to "'"'"extrinsic sources, including the ostensible objects to be achieved and the legislative history.'"'"' (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1145-1146.) Because "'"'"[t]he fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law"'"'" (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1176), we must ultimately "'"'"'"select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences"'"'"'" (*Burquet*, at p. 1146).

As applied here, the critical word within the phrase "advance payment or partial payment of damages" is "damages." Because "damages" are an element of every civil claim, the word is well defined and every definition is the same: Damages *compensate.*[5] (Civ. Code, § 3281 ["(e)very person who suffers detriment from the unlawful act or

---

[5] "Punitive damages" *punish.* (Civ. Code, §§ 3294 & 3295.) We need not decide whether Insurance Code section 11583 applies to advance payments of punitive damages (in the unlikely event a putative defendant would choose to punish itself by making advance payments on as-yet-unimposed punitive damages) because there is no allegation that Hawkes in giving the plaintiffs money and gifts, or the Archdiocese in paying for J. Doe's psychological counseling, was engaged in such remunerative flagellation.

omission of another, may recover from the person in fault a compensation therefor in money, which is called damages"]; *id.*, § 3333 ["(f)or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not"].)  As our Supreme Court put it, "[w]hatever their semantic differences, the statutory and dictionary definitions of 'damages' share several basic concepts.  Each requires there to be 'compensation,' in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 826; see also *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 551 [same]; *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 875 [same]; *Estate of De Laveaga* (1958) 50 Cal.2d 480, 488 ["'(t)he primary object of an award of damages in a civil action, and the fundamental principle or theory on which it is based, is just compensation or indemnity for the loss or injury sustained by complainant, and no more'"].)  Thus, not all payments of money to a plaintiff are "damages." (E.g., *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 37 ["neither workers' compensation benefits nor settlement proceeds are, at bottom, 'damages'"].)  Instead, as noted above, only those payments that are "compensatory" or "restitutive" are "damages." (*AIU Ins. Co.*, at p. 826 & fn. 11.)  Courts have accordingly confined the application of section 11583 to payments for a plaintiff's medical expenses (*Malinski v. Wegman's Nursery & Landscaping, Inc.* (1980) 102 Cal.App.3d 282, 285-287; *Blevin*, *supra*, 232 Cal.App.4th at p. 1325), for a plaintiff's property damage (*Jackson v. Andco Farms, Inc.* (1982) 130 Cal.App.3d 475, 477-478 (*Jackson*)), and, in sexual abuse cases, for a plaintiff's psychological counseling (*San Diego-Imperial Council*, *supra*, 239 Cal.App.4th at pp. 88-91; *Doe 1*, *supra*, 208 Cal.App.4th at pp. 1188, 1193-1194).

But what if a payment serves two purposes—one to compensate, and another to facilitate a crime?  Is that payment an "advance payment or partial payment of damages" within the meaning of section 11583?  We conclude it is not, and conclude that a

11

payment must be *solely* compensatory in order to qualify as "damages" under section 11583. Three reasons dictate this conclusion.

First, construing section 11583 to encompass money and gifts paid to facilitate crimes as well as to compensate leads to an absurd result we must avoid. (*California Charters Schools Assn.*, *supra*, 60 Cal.4th at p. 1237.) Payments a child molester makes to seduce and keep his victims open to future abuse—so-called "grooming" payments—are part and parcel of the sexual abuse itself. (E.g., *United States v. Long* (D.C. Cir. 2003) 328 F.3d 655, 665 ["the 'seduction process'" of a sex offender includes the use of "attention, kindness, gifts, and money to lower his or her victims' inhibitions"]; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 222 Cal.App.4th 149, 158 ["sexual grooming consists of planning and deliberate behaviors to befriend and establish an emotional connection with a child to have the child lower and abandon whatever inhibitions the child might have had against inappropriate sexual activities"].) Sexual abuse of a child is a crime. (Pen. Code, §§ 288, 288.5, 288a & 289.) So is paying a child not to report the sexual abuse. (*Id.*, § 136.1, subd. (b)(1) [efforts to "dissuade" a victim or witness not to report the offense to law enforcement]; see also *id.*, § 138 [payments not to testify].) People who make payments in furtherance of a crime cannot sue to recover those payments. (See *General Motors Acceptance Corp. v. Kyle* (1960) 54 Cal.2d 101, 112 [noting "the general rule that the guilty party to an illegal contract cannot enforce it or recover on principles of quasi contract benefits he has conferred under the contract"]; *Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 31 [party to an illegal contract may not sue to enforce that contract]; *Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1081 [same].) Because Insurance Code section 11583 provides that any prepayment of "damages" that tolls the limitations period must also be offset against any subsequent judgment or settlement, interpreting "damages" to encompass the payments Hawkes allegedly made in part to "groom" the plaintiffs and to keep them quiet would entitle the Archdiocese to offset those payments against any award the plaintiffs eventually obtained. The Archdiocese cannot sue to recover those payments, so it is

12

inconsistent and therefore absurd to let the Archdiocese accomplish the same result by reducing any subsequent damages award by those payments.

Second, interpreting section 11583 to apply to payments that further a crime as well as compensate would also implicitly repeal the statute of limitations period for the tort of child sexual abuse, another result we must avoid.  (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039 ["there is a strong presumption against repeal by implication"].)  Under section 11583, the statute of limitations is tolled upon the very first "advance payment or partial payment of damages" made without written notice of the applicable limitations period.  (*Associated Truck Parts, Inc. v. Superior Court* (1991) 228 Cal.App.3d 864, 868-869.)  If payments made in part to "groom" a child victim or to buy his silence qualify as "damages," then section 11583 would toll the limitation period from the moment of the very first gift or the very first payment of money (unless, of course, the molester also gave his victim contemporaneous written notice of the statute of limitations, something we doubt has or will ever happen).  Because "grooming" payments are a common tool of child abusers, interpreting "damages" under section 11583 to reach payments made in part to groom would toll the limitations period in a large majority (if not all) of child sexual abuse cases.  This would effectively repeal Code of Civil Procedure section 340.1, the statute of limitations for that tort.  Our Legislature has devoted a great deal of attention to striking the right balance between redress and repose in defining the statute of limitations period for childhood sexual abuse and, toward this end, amended the pertinent statute in 1990, 1994, 1998, 1999, and 2002.  (See Stats. 1990, ch. 1578, § 1; Stats. 1994, ch. 288, § 1; Stats. 1998, ch. 1032, § 1; Stats. 1999, ch. 120, § 1; Stats. 2002, ch. 149, § 1.)  We are loathe to interpret section 11583 in a manner that would implicitly repeal Code of Civil Procedure section 340.1 and, at the same time, render all of the Legislature's efforts—all of which came after section 11583's enactment in 1986—"idle acts." (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 390 ["'we do not presume that the Legislature performs idle acts'"], quoting *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 22.)

13

Lastly, reading section 11583 to encompass payments that facilitate crimes as well as compensate is inconsistent with that section's purpose. That purpose is straight-forward: Give putative defendants an incentive to compensate putative plaintiffs early by precluding evidence of such payments at trial and by crediting any payments against any future award, and ensure that the plaintiffs are not misled into viewing the defendants' largesse as an excuse not to diligently pursue litigation. (*Evans*, *supra,* 234 Cal.App.3d at p. 54.) Its purpose is *not* to give defendants who engage in criminal acts the right to recover payments made in pursuit of those acts. Its purpose is also not to exclude evidence relevant to show the defendant's substantive liability. However, if "damages" include payments made in part to "groom" or "hush" sexual abuse victims, then section 11583 would be co-opted to serve both of these impermissible goals, goals that are at odds with our Legislature's true purpose. As noted above, it would allow for offset of payments to further criminal conduct. Because section 11583 also precludes a plaintiff from treating an early payment of "damages" as "an admission of liability" (§ 11583), it would also preclude that plaintiff from introducing evidence of money and gifts conferred in part for purposes of "grooming" the victim or to bribe the victim to remain quiet— even though the first type of payment is an aspect of the abuse itself and the second type is probative of consciousness of guilt (and thus corroborative of the abuse).

Applying what we have determined to be the proper definition of "damages," we conclude that Hawkes's payments to J. Doe and L. Doe, contemporaneous with their sexual abuse, were not an "advance payment or partial payment of damages." Plaintiffs allege that Hawkes "lavish[ed]" them with meals, clothes, entertainment, travel, tuition, and cash to "compensat[e] . . . for the abuse he was commit[ting] upon them" and to "own" them. By these allegations, Hawkes's payments were designed *both* to compensate *and* to facilitate Hawkes's crimes of sexual abuse and dissuading a victim to report a crime (as aspects of Hawkes's "own[ership]" of them). Because these payments are not *solely* compensatory, they were not an "advance payment or partial payment of damages."

14

We also conclude that Archdiocese's payment of J. Doe's psychological counseling in 1996 *was* "an advance payment or partial payment of damages." (*San Diego-Imperial Council*, *supra*, 239 Cal.App.4th at pp. 88-91; *Doe 1*, *supra*, 208 Cal.App.4th at pp. 1188, 1193-1194.) However, section 11583 *tolls* the limitations period; it does not *revive* a period that has already expired. (*Jackson*, *supra*, 130 Cal.App.3d at p. 479.) Because the limitations period on J. Doe's claim lapsed at the latest in 1982, the Archdiocese's payment in 1996 is of no avail unless J. Doe's claim was somehow revived by the Legislature and still unexpired prior to that payment; we discuss that below.

> **b.     *Were Hawkes's payments of money and gifts authorized by the Archdiocese?***

Section 11583 applies its tolling provision to "the person" who made the "advance payment or partial payment of damages." (§ 11583.) In this case, *Hawkes* was the person who gave the plaintiffs money and gifts in the late 1970's and early 1980's; unless those payments are also considered payments by the *Archdiocese*, section 11583's tolling provision would not apply in this lawsuit against the Archdiocese. In determining whether Hawkes's acts are those of the Archdiocese, our focus is necessarily on the acts pertinent to tolling—that is, Hawkes's acts of making payments to the plaintiffs (not his acts of sexual abuse). We reach this question because its resolution may be relevant if plaintiffs opt to amend their complaint on remand.

As pertinent here, a principal may be liable for the wrongful conduct of its agent, even if that conduct is criminal, in one of three ways: (1) if the "'principal directly authorizes . . . [the tort or] crime to be committed'" (*People v. Williams* (2004) 118 Cal.App.4th 735, 743); (2) if the agent commits the tort "in the scope of his employment and in performing service on behalf of the principal" (*Draper v. Hellman Commercial Trust & Sav. Bank* (1928) 203 Cal. 26, 38-39; *Johnson v. Monson* (1920) 183 Cal. 149, 151), "regardless of whether the wrong is authorized or ratified by [the principal]" (*Nuffer v. Insurance Co. of North America* (1965) 236 Cal.App.2d 349, 355; *Hudson v. Nixon* (1962) 57 Cal.2d 482, 484), and even if the wrong is criminal (*Nuffer*,

at p. 355); see generally Civ. Code, § 2338; or (3) if the principal ratifies its agent's conduct "after the fact by . . . voluntar[ily] elect[ing] to adopt the [agent's] conduct . . . as its own" (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 810; *Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73).

Here, Hawkes's alleged control over the Archdiocese's finances and his power to spend the Archdiocese's money were within the scope of his employment. Plaintiffs allege that for many years Hawkes "controlled the finances of the" Archdiocese and had the authority "to conduct any and all transactions that had a monetary cost." His cash and other gifts to plaintiffs fall within this grant of authority, regardless of whether those payments also constituted a tort or crime and regardless of whether the Archdiocese ever authorized or ratified those payments. Plaintiffs argue that the power of attorney limited Hawkes's authority to act to conduct that was "lawful[]." However, the express language of the power of attorney did two things—it granted Hawkes the "full power and authority to do and perform all and every act" and it ratified his "lawful[]" acts. The "lawful[]" limitation constrained the Archdiocese's ratification, but not its initial conferral of authority, and it is this authority that forms the basis for the Archdiocese's liability here. Because Hawkes's payments are attributable to the Archdiocese on this basis, we have no occasion to examine whether Hawkes's actions were also directly authorized or otherwise ratified by the Archdiocese.

### 2. Were plaintiffs' claims revived by subsequent legislative act?

As explained above, J. Doe had until 1981 or 1982 to file suit for Hawkes's sexual abuse and L. Doe had until 1982 or 1986. Because our Legislature has the power to revive expired claims (*Quarry*, *supra*, 53 Cal.4th at pp. 955, 970), we must examine whether any of our Legislature's subsequent amendments to the statute of limitations for childhood sexual abuse claims revived plaintiffs' claims. (The Legislature extended the statute of limitations for battery, assault and wrongful injury to adults from one year to two years in 2003, but that amendment did not revive expired claims. (Code Civ. Proc., § 335.1, added by Stats. 2002, ch. 448, § 2.).)

16

In 1986, 1990 and 1994, the Legislature extended the limitations period against the persons who perpetrated the child sexual abuse, and revived any claims that were timely under the amendment even if they had expired prior to the amendment. (See former Code Civ. Proc., § 340.1, subds. (a) & (e)(1) (1986); Stats. 1986, ch. 914, § 1 [extending period from one to three years for perpetrators who were "household or family member(s)"]; Code Civ. Proc., § 340.1, subds. (r) & (s); former § 340.1, subd. (a) (1990) [extending period to plaintiff's 26th birthday or within three years of discovery of psychological injury]; former § 340.1, subds. (o) & (p) (1994) [reviving claims that would be timely under the 1990 amendment]; Stats. 1994, ch. 288, § 1; 1994 Cal. ALS 288; Stats. 1990, ch. 1578, § 1.) Because these amendments did not alter the time period involving *third parties*, such as the Archdiocese, they are irrelevant.

In 1998 and 1999, the Legislature extended the limitations period for suing third parties for childhood sexual abuse, but only if the lawsuit was filed before the victim's 26th birthday, and revived any claims that were timely under this new rule, even if they had previously expired. (Code Civ. Proc., § 340.1, subd. (u); *Quarry*, *supra*, 53 Cal.4th at p. 967; Stats. 1999, ch. 120, § 1, p. 1735; former § 340.1, subds. (a)(2), (a)(3) & (b) (1998); Stats. 1998, ch. 1032, § 1; 1998 Cal. ALS 1302; *Quarry*, at p. 965 [noting how 1998 amendment "for the first time included certain third party defendants"].) Plaintiffs cannot avail themselves of this revival period because, in 1998, they were both well over age 26 (J. Doe was 35 or 36, and L. Doe was 34).

In 2002, the Legislature carved out an exception to the rule that a plaintiff suing for sexual abuse always had to sue a third party before the victim's 26th birthday. This exception authorized suit "within three years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual abuse," even after the plaintiff's 26th birthday, if the third party "knew or had reason to know, or was otherwise on notice, of any unlawful conduct by an employee, volunteer, representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of unlawful sexual conduct in the future by that person." (Code Civ. Proc., § 340.1, subds. (a)(2),

(a)(3) & (b)(2); Stats. 2002, ch. 149, § 1; 2002 Cal. ALS 149.) The Legislature expressly stated that plaintiffs whose claims would be timely under this amendment could bring suit "within one year of January 1, 2003," even if their claims had expired. (§ 340.1, subd. (c).) Although plaintiffs' claims may have been revived by this 2002 amendment, they did not file suit until 2014, far outside the statutory window for claims revived by this amendment to be filed.

We consequently conclude that plaintiffs' claims expired, were not tolled by section 11583, and were never revived. The trial court correctly sustained the demurrer to their complaint.

## II. Should Plaintiffs Be Granted Leave to Amend?

As noted above, plaintiffs must be granted leave to amend if "there is a reasonable possibility that the defect can be cured by amendment." (*Zelig*, *supra*, 27 Cal.4th at p. 1126.) Although the gifts and money Hawkes gave to the plaintiffs contemporaneous with their sexual abuse were not an "advance payment or partial payment of damages," the operative complaint indicates that the abuse of J. Doe stopped in 1981 and the abuse of L. Doe stopped in 1984 or 1985. The complaint alleges when the payments started, but is silent as to when they stopped. To the extent Hawkes made payments that were not in part for purposes of grooming or encouraging the plaintiffs not to report the abuse, there is a "reasonable possibility" that those payments may be solely compensatory and thus subject to tolling under section 11583. We remand to give plaintiffs the opportunity to so plead, if the facts support such an allegation and are consistent with the allegations pled in earlier complaints.

## DISPOSITION

The order of the trial court is reversed and remanded.  Each party to bear its own costs on appeal.

## CERTIFIED FOR PUBLICATION.


_____, J.
HOFFSTADT

We concur:

_____, P.J.
BOREN


_____, J.
CHAVEZ