Filed 5/19/22; Modified and Certified for Publication 6/15/22 (order attached)
Opinion following transfer from Supreme Court

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHARLES RATCLIFF, JR., et al., | B302558 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19STCV20138) |
| v. | |
| THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth R. Feffer, Judge.  Affirmed.

McKool Smith Hennigan, J. Michael Hennigan, Lee W. Potts and Elizabeth S. Lachman for Defendants and Appellants.

Law Offices of Anthony DeMarco, Anthony M. DeMarco; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy and Kevin K. Nguyen for Plaintiffs and Respondents.

_____

Seven adults allege they were molested by a priest when they were children.  They brought suit against The Roman Catholic Archbishop of Los Angeles and related entities (Archdiocese or defendants), alleging defendants were vicariously liable for ratifying the molestation and directly liable for their own negligence in failing to supervise the priest, and related acts and omissions.  The Archdiocese moved to strike the operative complaint under the anti-SLAPP law (Code Civ. Proc., § 425.16), arguing that some of the acts by which it purportedly ratified the molestation or acted negligently constituted speech or litigation conduct protected by the anti-SLAPP statute.  We conclude the anti-SLAPP motion was appropriately denied, and therefore affirm.

## FACTUAL ALLEGATIONS

### 1.    *The Parties*

Plaintiffs are seven alleged molestation victims; some sued in their own names, others preferred a "John Doe" designation.  As their identities were revealed in discovery, the Archdiocese calls them all by their names in its briefs on appeal.  In contrast, plaintiffs continue the naming conventions of their complaint, using names for some plaintiffs and John Does for others.  In an abundance of caution, and to aid readability, we refer to the plaintiffs, in chronological order of alleged molestation, as Doe 1 through Doe 7.

Defendants are The Roman Catholic Archbishop of Los Angeles, a corporation sole; the Archdiocese of Los Angeles Education and Welfare Corporation; and three individual Catholic churches where the molestation allegedly occurred (St. Christopher in West Covina, St. Mary in Palmdale, and St Lawrence Martyr in Redondo Beach).  For our purposes and

2

unless the context requires otherwise, it is sufficient to refer to the defendants collectively as the Archdiocese. The priest who allegedly committed the molestation, Father Christopher Cunningham, is not a named defendant. Plaintiffs allege that the Archdiocese is liable for Father Cunningham's alleged acts of molestation.

At the time the anti-SLAPP motion was denied, the trial court also sustained with leave to amend the defendants' demurrer, on the grounds of lack of specificity. The trial court expressed concern that the operative complaint was not clear as to which complainant was alleging which cause against which defendant.

## 2. *The Facts as Alleged in the First Amended Complaint*

The operative first amended complaint paints the picture of an Archdiocese which was willfully blind to its strong suspicions – and, perhaps, actual knowledge – of Father Cunningham's misconduct. We reiterate, these are only allegations. Plaintiffs allege that, rather than taking curative action in response to suspicions of, and accusations against, Father Cunningham with investigations, supervision, and limitation of access to children, the Archdiocese swept the charges under the proverbial rug and simply reassigned Father Cunningham to other parishes, where he was free to molest again.

We discuss the allegations in some detail, with particular attention to those by which plaintiffs assert the Archdiocese is liable for Father Cunningham's acts of abuse and molestation.[1]

---

[1] We observe at the outset that the anti-SLAPP analysis has two prongs – first, whether the complaint arises from protected activity as described in the anti-SLAPP statute; and second,

A. *Allegations Concerning the Archdiocese's Preexisting Policy for the Prevention of Child Molestation by Priests*

According to the complaint, by 1989, prior to Father Cunningham's ordination, the Archdiocese had received complaints that no less than 22 of its priests had sexually molested children. It therefore "reduced to writing its policies for the prevention of child molestation by its priests," and provided a copy to all priests. "The policy prohibited priests: (1) having minors in their living quarters; (2) taking minors on unchaperoned outings; [and] (3) tickling, wrestling, kissing or hugging minors."

Father Cunningham was ordained a priest in the Archdiocese in 1990, when the written policy was in effect.

B. *First Parish – Doe 1*

Father Cunningham was first assigned as an associate pastor at St. Christopher. As alleged, "Soon after his arrival he began wrestling minors, tickling them, and asking them to go with him unchaperoned to movies and other fun activities." This was done openly on the school playground, visible to parish employees.

_____

whether the plaintiff has established a probability of prevailing. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).) We resolve this appeal on the first prong – whether the allegations of the complaint arise from protected activity. The evidence submitted by both parties related to the second prong – whether the plaintiffs have a probability of prevailing – is not directly relevant to whether the complaint arises from protected activity. Nevertheless, we describe the factual allegations in detail in order to provide context for our analysis of the first prong.

4

One of the boys who received the attention of Father Cunningham was 12-year-old Doe 1, whose mother worked at the church. One day in 1991, when Father Cunningham learned that Doe 1's mother was away on church business, Father Cunningham went to Doe 1's home. He went to the door and asked for Doe 1's mother; Doe 1 told Father Cunningham that his mother was not home and Father Cunningham could not come in. Father Cunningham entered anyway and sat down on the sofa next to the boy. Father Cunningham rubbed the boy's back and thigh, despite Doe 1's attempts to move away. Father Cunningham was interrupted by Doe 1's mother, who returned home early. She told Father Cunningham that he was not permitted in their home without her permission. She reported the conduct to a nun at the church and the church school's principal. Doe 1 also complained to the parish pastor. Father Cunningham continued his prohibited interactions with young boys unabated, "taking them to the movies, giving them gifts, playing with them and tickling them." Doe 1's mother believed this was "sexualized conduct" and that he was "grooming young boys."

C.     *Second Parish – Does 2, 3 and 4*

In 1994, Father Cunningham was assigned as an associate pastor at St. Mary. That year, the Archdiocese updated its policy for the prevention of child molestation. Now, the policy required any priest who became aware of a fellow priest's violation of the Archdiocese's policy to confront the violator and report the violation to the Vicar for Clergy.

According to the complaint, at St. Mary, Father Cunningham continued to violate the policy – he spent "extraordinary amounts of time alone with teen boys." He took

them to the movies or for ice cream one-on-one; he wrestled them; he hugged them; he had them alone in his rectory bedroom. Parish staff observed Father Cunningham's conduct with the boys. The church pastor was aware that Father Cunningham had boys one-on-one alone with him in his rectory bedroom; the pastor informed parish staff that Father Cunningham was not allowed to have minors alone with him in his bedroom.

One of these boys was Doe 2 – Father Cunningham regularly wrestled with him and spent time alone with him in his bedroom. At least one other priest, Father Gleason, "expressed concern" about Father Cunningham bringing Doe 2 into the rectory. There were two incidents in which Father Cunningham wrestled with Doe 2 until one of Doe 2's family members stopped the wrestling when they believed the physical contact was inappropriate. In one such incident, Father Cunningham's groin was pressing against the child's rear end. When Doe 2 was 12 or 13, Father Cunningham took him alone to the movies and, during the movie, massaged the boy's genitals with his hand. Sometime later, he invited Doe 2 to his rectory bedroom. There, he told the boy that the Holy Spirit had a special connection with them and that was why they had a special way of showing affection, which nobody else could understand – Father Cunningham was groping the boy as he said this, and continued to engage in further sexual conduct. Doe 2 did not report this because Father Cunningham "was his friend and priest, because he believed him, because he loved him and trusted him."

Doe 3 worked in the parish office. Father Cunningham wrestled with Doe 3 in his rectory bedroom. Father Gleason, the priest who had "expressed concern" about Father Cunningham bringing Doe 2 into the rectory, warned Doe 3 "not to trust Father Cunningham." Shortly after this warning, Father

Cunningham came into the parish office where Doe 3 was working alone and molested him by touching his genitals.

Doe 4 was an altar server at St. Mary. Father Cunningham molested him as well, hugging him, caressing his lower back, and putting his fingers inside Doe 4's pants. Doe 4, who was then 15, felt like Father Cunningham was making a sexual advance and he felt trapped. He told his mother that he did not want to be around Father Cunningham anymore. His mother agreed that he need not be. She then paid more attention to Father Cunningham and learned that he invited many boys out one-on-one. Doe 4's mother suspected that he may be acting inappropriately with the boys.

Plaintiffs also alleged that Father Miskella, another priest at St. Mary, wrote an evaluation in which he characterized Father Cunningham as too "immature." "Immature" has been "a code word used by Catholic Clergy for many years to describe a priest who spends too much time with minors and who is possibly sexually abusing them." Father Miskella also confidentially informed the Vicar for Clergy that he should speak with Father Gleason about Father Cunningham. Father Miskella concluded that Father Cunningham "is not mature enough to be a pastor." There is no indication that "any effort was made to discuss with Father Gleason his concerns or thoughts regarding Father Cunningham."

In 1998, a new priest became the administrator at St. Mary. Having learned that Father Cunningham had an underage boy in his rectory bedroom, the administrator counseled him not to do this. He also reported to the Archdiocese that "Father Cunningham was immature and had instances of imprudent conduct." As alleged, there was no follow-up.

In 1999, a complaint was made to the Vicar for Clergy that Father Cunningham had molested a minor (not one of the plaintiffs here). The Vicar for Clergy subsequently acknowledged that complaint in a letter, which also stated that "all such records were going to be maintained permanently" by the Archdiocese, but those records are presently missing. There is no record that the Archdiocese conducted any investigation into this complaint.

D.  *Third Parish – Does 5, 6 and 7*

In 1999, Father Cunningham was transferred to St. Lawrence Martyr, still as an associate pastor. He immediately resumed "taking underage parish boys on unchaperoned outings, wrestling them, tickling them, hugging them, and having them in his rectory bedroom." All of this conduct was known to parish priests.

Doe 5 was a student at St. Lawrence Martyr; Father Cunningham sexually abused him on multiple occasions on school grounds and during school activities – including, at one point, reaching into the boy's gym shorts and touching his genitals. Doe 5 told his mother that Father Cunningham was "harassing" him. His mother reported this to church staff, but nobody followed up on Doe 5's complaints, and Father Cunningham's behavior continued unchecked. When the school year ended, Doe 5 and his mother stopped attending that church. The head pastor, Monsignor Lenihan, telephoned and apologized to Doe 5's mother for Father Cunningham's conduct, explaining that he "was immature and that he had maturity issues."

The complaint alleged that Does 6 and 7 were also molested by Father Cunningham at St. Lawrence Martyr. It began with wrestling, hugging, and tickling, and escalated to Father Cunningham having the boys alone in his rectory bedroom where

he "sexually molested them in significant ways." This behavior continued until shortly before Father Cunningham left the parish in 2001. Parish staff members were aware that Father Cunningham had underage boys alone in his rectory bedroom; at least one parish staff member reported this to the head pastor, Monsignor Lenihan. Instead of taking action to address the complaint, Monsignor Lenihan "actively championed" Father Cunningham and supported him so that he would be promoted from associate pastor to pastor of his own parish.

E.    *Aftermath*

The complaint alleged that, in 2001, "despite all of the complaints that Father Cunningham was sexually abusing under-aged boys, despite all the complaints and awareness of his routine violation of [the Archdiocese's] policies and prohibitions of the prevention of priests sexually molesting minors," he was promoted to pastor and assigned to his fourth church, St. Louise, in Covina. He immediately continued wrestling boys, taking them on unsupervised outings and having them in his rectory bedroom. An associate pastor complained in writing to the Archdiocese about Father Cunningham's conduct with teen boys. Although the associate pastor identified some of the boys by name, there is no record that the Archdiocese investigated by interviewing the young men.

Continued complaints were made to the Archdiocese regarding Father Cunningham's conduct, including that he was observed "kissing two late teen boys at a local Denny's." Father Cunningham identified one of the boys to the Archdiocese (the boy confirmed the kiss, and said it was "routine"), but the Archdiocese made no attempt to identify the other boy.

In 2004, Father Cunningham moved to his fifth

9

assignment (Our Lady of Assumption, in Ventura).  A few months later, he was accused of suspicious conduct with a minor on a trip to Europe – he was discovered in a hotel room, alone with a minor, with the minor's belt in his hands.  There is no record of the Archdiocese "taking any action to either investigate the complaint or impose any discipline upon Father Cunningham."  Instead, Father Cunningham took a leave of absence, and the Archdiocese began financially supporting him.

In 2008, Father Cunningham was listed on an Archdiocese document as "having a credible allegation of child sexual abuse having been made against him."  Plaintiffs also alleged that in 2015, another victim of Father Cunningham's – who is not a plaintiff in this action and to whom we refer as Roe – brought suit against Father Cunningham.  In 2017, the Los Angeles County Sheriff's Department began a criminal investigation into complaints against Father Cunningham.  The Archdiocese had continuously paid for Father Cunningham's maintenance and support since 2005, and did not stop in response to Roe's civil suit or the criminal investigation.  The Archdiocese paid for lawyers to defend him, hired an investigator to "dig up dirt" on his victims, paid for Father Cunningham to fly to Los Angeles to attend depositions of the victims "in an attempt to intimidate them and silence them," and tried to sway the prosecution away from bringing charges.  In January 2019, the Archdiocese settled the civil action brought by Roe for "a life-changing" sum.  Even after settling the Roe action, the Archdiocese "authorized the continued financial support" of Father Cunningham "and of the lawyers representing him, so that they could continue to lobby the Los Angeles District Attorney against pressing criminal charges for child molestation against Father Cunningham."

## PROCEDURAL BACKGROUND

### 1. *The Complaint*

Plaintiffs filed their original complaint in this case on June 10, 2019.[2] The first amended complaint was filed one month later. The complaint states three causes of action, although only the first two are at issue in this appeal.[3]

Before it formally identifies the specific causes of action, the complaint alleges the lengthy history of Father Cunningham's abuse of minors within the church, including his specific molestation of the seven plaintiffs. We have summarized those allegations above. The complaint also includes general allegations that the Archdiocese, through its "agents and managing agents, knew of prior complaints that Father Christopher Cunningham had sexually molested a minor(s), prior to the end of his abuse of Plaintiffs. [The Archdiocese] through [its] agents and managing agents, knew or had reason to know that Father Christopher Cunningham routinely violated rules of Defendants that were designed to prevent child molestation by clergy." It further alleges that Father Cunningham was a "priest, employee and an agent" of the Archdiocese when he met the plaintiffs and abused them. It alleges that, at all times, the Archdiocese, "employed, supervised and controlled the

---

[2] Some of the plaintiffs in this action had previously filed separate actions, which they then voluntarily dismissed without prejudice, prior to bringing this action.

[3] The third cause of action was for violation of civil rights under the Unruh Civil Rights Act. (Civ. Code, § 51.) In response to the defendants' demurrer, plaintiffs agreed to withdraw this cause of action. Ultimately, plaintiffs orally dismissed the Unruh Act cause of action with prejudice.

11

employment as a priest of" Father Cunningham, as well as the other employees and agents at the churches where he worked.

The first cause of action is for "Child Sexual Abuse/Sexual Battery." It alleges that the Archdiocese is vicariously liable for the sexual abuse committed by Father Cunningham because it both authorized and ratified the abuse. Plaintiffs alleged that the Archdiocese "ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise" Father Cunningham. They allege the Archdiocese further ratified the abuse by "concealing evidence of sexual abuse of other children by" Father Cunningham from plaintiffs, their families, law enforcement, and other Archdiocese personnel "who could have been in a position to prevent the abuse of Plaintiffs" if they had known of the prior complaints.

The complaint alleges, "Defendants have routinely over the years failed to discipline, investigate or terminate known child molesting priests. Instead, Defendants condoned the conduct of priests molesting children by protecting offending clerics from public scorn and civil authorities, often transferring them from town to town, county to county, state to state, and country to country, all to allow child molesting priests to escape prosecution and protect their reputations, as well as the reputation of the Defendants. By doing so, Defendants have systematically encouraged and condoned this conduct by more priests including Father Christopher Cunningham."

The complaint then contains several paragraphs of allegations stating that, upon learning of Roe's civil complaint against Father Cunningham, and despite knowledge "of other complaints that Father Christopher Cunningham had molested children," the Archdiocese nonetheless "opted to immediately begin paying for Father Christopher Cunningham's personal

12

lawyer" and "continued its financial support of Father Christopher Cunningham." Even after learning of additional complaints against Father Cunningham – including those of several plaintiffs in this case, the Archdiocese "continued its support of and continued paying for the defense" of Father Cunningham in both the Roe litigation and criminal investigation. "Those efforts continue to the present day." Notably, while these paragraphs detail the Archdiocese's continued financial support of Father Cunningham after the evidence mounted against him, they do not specifically allege that this support constituted ratification of the sexual abuse.

The second cause of action is for negligence. Plaintiffs allege that by law the Archdiocese had a special relationship with the children entrusted to its care, which gave rise to a duty to protect them from harm. Plaintiffs allege, "Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Father Christopher Cunningham's dangerous and exploitive propensities and/or that Father Christopher Cunningham was an unfit agent. It was foreseeable that if Defendants did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to the Plaintiffs, the children entrusted to Defendants' care would be vulnerable to sexual abuse by Father Christopher Cunningham."

Plaintiffs allege that defendants breached this duty of care by allowing Father Cunningham "to come into contact with the minor Plaintiffs without supervision; by failing to adequately supervise, or negligently retaining Father Christopher Cunningham who they permitted and enabled to have access to Plaintiffs; by failing to investigate or otherwise confirm or deny such facts about Father Christopher Cunningham; by failing to

13

tell or concealing from Plaintiffs, Plaintiffs' parents, guardians, or law enforcement officials that Father Christopher Cunningham was or may have been sexually abusing minors; and/or by holding out Father Christopher Cunningham to the Plaintiffs and their parents or guardians as being in good standing and trustworthy."

Next, plaintiffs allege that the Archdiocese had a duty "to educate, train and warn" plaintiffs "regarding prevention, detection and reporting of child abuse" to help safeguard them, but failed to do so. Plaintiffs allege a breach of duty arising from the Archdiocese's decision to give copies of its written policies for the prevention of child molestation only to priests. The Archdiocese also had a duty to provide the policies to nonpriest parish staff and parents in the community, people who could have reported that Father Cunningham was routinely violating these policies.

Finally, plaintiffs allege that a number of parish staff members who witnessed Father Cunningham's suspicious conduct were mandated reporters under Penal Code section 11165.7, but the Archdiocese violated its obligation under the law to educate them about their reporting duties – a violation which was a proximate cause of plaintiffs' abuse.[4]

## 2. *The Demurrer*

On August 29, 2019, defendants demurred. The demurrer raised numerous grounds, including misjoinder of plaintiffs,

---

[4]     Mandated reporters under Penal Code section 11165.7 include teachers, teacher's assistants, private school administrative officers, clergy members, and custodians of records of clergy members.

misjoinder of defendants, and failure to state a cause of action.[5] Plaintiffs opposed the demurrer. The trial court heard the demurrer and anti-SLAPP motion together.

### 3. *The Anti-SLAPP Motion*

On September 25, 2019, the Archdiocese filed its anti-SLAPP motion.

#### A. *Overview of Anti-SLAPP Motions*

An anti-SLAPP motion presents a means by which a defendant, sued for conduct in furtherance of the constitutional right of petition or free speech, can place the burden on a plaintiff to establish that there is a probability of prevailing on the claim or face early dismissal of the action. (Code Civ. Proc., § 425.16, subd. (b)(1).) If the defendant first establishes a prima facie showing that a claim is based on so-called "protected activity," the burden switches to the plaintiff to establish the lawsuit has at least minimal merit. (*Park, supra,* 2 Cal.5th at p. 1061.)

Before a trial court may proceed to the second prong, the moving defendant must satisfy the first prong – that is, establish that the cause of action arises from protected activity, as the term is defined by statute. Code of Civil Procedure section 425.16, subdivision (e) is the operative provision and describes four categories of protected speech and conduct: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by

---

[5] Although we refer to the defendants collectively as "the Archdiocese," the complaint was filed against a number of different defendants, and the defendants argued as part of their demurrer that several of them were improperly named because the complaint did not specifically identify what each defendant purportedly did to be liable to each plaintiff.

15

law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or issue of public interest."

B. *Defendants' Argument in Support of their Anti-SLAPP Motion*

The Archdiocese's anti-SLAPP motion argued that the complaint was based on both protected speech and litigation conduct.

As to the first cause of action for sexual abuse, the Archdiocese argued that the only allegations against it were its support of Father Cunningham in Roe's civil action and in the sheriff's criminal investigation – conduct it argued was protected litigation activity.

As to the negligence cause of action, the Archdiocese focused on a handful of allegations from plaintiffs' complaint which could be characterized as speech – or, more precisely, the decision not to speak – on an issue of public interest, and argued that those allegations were, in fact, the basis of the complaint against it. Those allegations were: (1) the failure to inform parish communities about allegations of abuse against Father Cunningham and instead holding him out as trustworthy; (2) the failure to communicate the Archdiocese's policy for the prevention of molestation to nonpriest staff and members of the community; (3) the failure to educate, train and warn plaintiffs about sexual

16

abuse; and (4) the failure to inform staff who were mandated reporters about their duties as mandated reporters under the law.

The parties disagree on appeal as to whether, and to what extent, the Archdiocese sought to strike specific allegations from these two causes of action, rather than the causes of action in their entirety. To be sure, the Archdiocese's formal "Notice of Motion" indicated that the motion would seek, in the alternative to striking both causes of action, to strike a number of individual paragraphs, subparagraphs, and lines of the first amended complaint (identified by paragraph and line number).[6] But the Archdiocese did not address this alternative in its memorandum of points and authorities in support of the motion—though it should have.[7] Instead, the Archdiocese argued in its supporting papers that the causes of action were based on protected activity as a whole. For this reason, the trial court – and this court in its initial majority opinion – approached the anti-SLAPP motion as if the motion had addressed the entirety of each cause of action and not individual allegations.

---

[6]   The notice of motion also raised a second alternative argument – that the first and second causes of action should be dismissed (1) for failure to state a claim, and (2) as barred by several statutory privileges and the Establishment clause. The Archdiocese does not pursue this alternative argument on appeal.

[7]   *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*) (["At the first step, the moving defendant bears the burden of identifying all allegations of protected activity*, and the claims for relief supported by them*"], italics added.)

C.    *Plaintiffs' Opposition*

Plaintiffs' opposition to the motion argued that the speech and petitioning conduct identified in the Archdiocese's motion were merely supporting evidence of the Archdiocese's vicarious liability, not the tortious acts on which the complaint was based. Plaintiffs argued the complaint was about conduct:  Father Cunningham's sexual abuse and the Archdiocese's "failures to take appropriate steps to prevent that abuse."

As to the first cause of action, plaintiffs argued that the Archdiocese's payment of Father Cunningham's attorney fees was merely evidence of the Archdiocese's ratification of his molestation.  But it was the ratification itself that rendered the Archdiocese vicariously liable.  Plaintiffs explained that the Archdiocese was aware of Father Cunningham's molestation and routine violation of its policies for the prevention of molestation. Despite that knowledge, the Archdiocese ratified Father Cunningham's conduct by its failure to "investigate, discipline or better supervise him," its "withholding of or destruction of records of complaints," its "promotion of Father Cunningham after such complaints," and its "support of him financially throughout."

Plaintiffs argued that their negligence cause of action was based on three theories, which they itemized as negligent supervision and retention; negligence per se under the mandatory reporting statutes; and negligent "failure to educate train or warn."  Plaintiffs argued that negligent supervision and retention of Father Cunningham is not protected speech or litigation activity.  As to the other theories, plaintiffs argued that inaction does not rise to the status of protected conduct.

18

D.    *The Archdiocese's Reply*

In reply, the Archdiocese acknowledged that plaintiffs took the position that the conduct on which they based their first cause of action was the molestation itself.  But, they responded, "That, however, is contrary to the allegation that the acts that make the Archdiocese liable 'in the present case' are actions in the prior [Roe] litigation.  [Citation.]  There is no claim against Cunningham in this case.  The allegations regarding Cunningham and molestation are 'Background Facts.'  [Citation.]  The alleged 'liability-creating activity' of the Defendants for ratification is acts in furtherance of the right to petition the Court."[8]

---

[8]    This argument, which the Archdiocese continues to pursue on appeal, is a misquoted citation to the plaintiffs' use of "In the present action" at the beginning of paragraph 112 of their complaint.  The language of paragraph 112 is not without some uncertainty; nonetheless, it does not support the interpretation the Archdiocese pursues.  Plaintiffs allege, "In the present action, after learning of the first lawsuit filed against Father Christopher Cunningham in 2015 alleging Father Christopher Cunningham did sexually molest the plaintiff when the plaintiff was a minor, the [Archdiocese], despite its knowledge of other complaints that Father Christopher Cunningham had sexually molested children opted to immediately begin paying for Father Christopher Cunningham's personal lawyer."  This appears to be an allegation that the Archdiocese chose to pay for Father Cunningham's defense in the present action itself, despite its knowledge of the myriad accusations against him.  It is not, as the Archdiocese interprets it, a representation that all allegations that came before are mere background, and the allegations that follow are the only allegations on which liability is based "[i]n the present action."

19

As to negligence, the Archdiocese reasserted that the negligence claims arose out of protected speech, and more precisely, its decision to not speak.

E.    *Hearing and Ruling*

After spirited argument, the trial court stated that, when focusing on the allegations of the complaint, "[t]his case is really about, allegation-wise, a failure to properly investigate and train and report acts of child abuse and at what level there should have been training, at what level there should have been reporting." The court rejected the Archdiocese's argument that the first cause of action arose from its litigation conduct, concluding, "it's clear that plaintiffs' cause of action for sexual assault and sexual battery is based upon and seeks to recover damages for Father Cunningham's improper sexual conduct related to the plaintiffs," and the Archdiocese's vicarious liability for it. Accordingly, the court concluded the complaint did not allege conduct protected by the anti-SLAPP law.

As to the cause of action for negligence, the court found that plaintiffs had alleged a breach of duty of care by allowing Father Cunningham to come into contact with the plaintiffs without adequate supervision, negligently retaining him, failing to investigate allegations of misconduct, concealing from plaintiffs, their parents and law enforcement that Father Cunningham was or may have been sexually harassing children, and holding Father Cunningham out as trustworthy. While the court recognized there may be speech, or lack of speech, involved, the court believed that, viewed in its entirety, the cause of action

was not based on protected conduct.  The anti-SLAPP motion was denied.[9]

The court then turned to the demurrer, and sustained it on several grounds with leave to amend.[10]

The Archdiocese filed a timely notice of appeal from the denial of its anti-SLAPP motion.

---

[9]    On appeal, the Archdiocese characterizes the trial court's ruling as follows:  "Even though it found that no claim was legally sufficient, it denied the motion because it disapproved of the petitioning and speech activities involved."  Our review of the record reveals a conscientious trial court attempting to properly rule on a motion implicating a challenging and complex area of the law.

[10]    The trial court's ruling on the demurrer was as follows:
"The Demurrer is OVERRULED on commonality ground. The Demurrer is SUSTAINED as to specificity ground.  The Court sustains the demurrer as to the 4th, 8th to 16th causes of action.  The Court overrules the demurrer as to 1st, 2nd, 3rd, 5th, 6th, 7th, and 17th causes of action.
"The Court grants 30 days leave to amend.  Counsel are to meet and confer on the issue."
By "causes of action," we presume the court was referring to the multiple enumerated grounds expressly asserted in the demurrer; the complaint itself had only three causes of action, one of which plaintiffs dismissed.
The parties disagree whether the court's ruling reflected its view of the substantive merits of the complaint.  As the ruling on the demurrer is not before us on appeal, as we explain in Part 4 of our discussion, we express no opinion.

### 4.    *Initial Appeal and Supreme Court Remand*

On appeal, we affirmed the trial court's decision on the anti-SLAPP motion.  The Archdiocese sought review.  On September 1, 2021, the Supreme Court remanded the matter with directions that we vacate our decision and reconsider it in light of its recent decision in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009-1012 (*Bonni*).  We vacated our decision, received additional briefing, held oral argument, and now reconsider our opinion.[11]

## DISCUSSION

### 1.    *Standard of Review; Protected and Unprotected Activity*

"We review de novo the grant or denial of an anti-SLAPP motion.  [Citation.]  We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity.  [Citations.]  In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based.  [Citations.]  We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law.  [Citation.]"  (*Park, supra,* 2 Cal.5th at p. 1067.)

"A claim arises from protected activity when that activity underlies or forms the basis for the claim.  [Citations.]  Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.'  [Citations.]"  (*Park, supra,* 2 Cal.5th at pp. 1062-

---

[11]    During supplemental briefing, plaintiffs moved to strike certain portions of the Archdiocese's brief.  We deny the motion.

1063.)  "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.'  [Citation.]  Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute.  [Citations.]" (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)

When a cause of action contains both protected and unprotected activity, the defendant may move to strike particular claims supported by allegations of protected activity within that cause of action.  (*Baral*, *supra*, 1 Cal.5th at p. 392.)  Even when the moving defendant seeks only to strike a cause of action in its entirety, courts must analyze each separate claim for relief within the cause of action to determine whether the acts are protected.  (*Bonni, supra,* 11 Cal.5th at pp. 1010-1011.)  However, "[i]f a cause of action contains multiple claims and a moving party fails to identify how the speech or conduct underlying some of those claims is protected activity, it will not carry its first-step burden as to those claims."  (*Id.* at p. 1011; *Pech v. Doniger* (2022) 75 Cal.App.5th 443, 459.)

As we have observed, in the trial court the Archdiocese's supporting papers addressed each of the two causes of action in plaintiffs' complaint as a whole.  On appeal, however, the Archdiocese relies on the alternative argument raised in its Notice of Motion:  that individual allegations of the complaint should be stricken.

23

We consider each cause of action individually. To the extent a cause of action is based on multiple claims for relief, we consider the claims separately.[12]

## 2. *First Cause of Action – Child Sexual Abuse/Sexual Battery*

Plaintiffs' first cause of action is for child sexual abuse/sexual battery, and alleges the Archdiocese is liable for Father Cunningham's molestation of plaintiffs due to its authorization and ratification of that conduct.

### A. *Law of Ratification*

" 'As an alternate theory to respondeat superior, an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort. [Citations.] The failure to discharge an employee who has committed misconduct may be evidence of ratification. [Citation.] The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. [Citations.] Whether an employer has ratified an employee's conduct is generally a factual question. [Citation.]' [Citations.]" (*C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1110-1111.) "A principal may be liable when it ratifies an originally unauthorized tort. [Citations.] And generally, the ratification relates back to the time the tortious act occurred. [Citations.] As noted, ratification

---

[12] In *Baral*, the Supreme Court indicated that it sometimes used "cause of action" to refer to a count as pleaded, while the proper subject of an anti-SLAPP motion is a "claim." (*Baral, supra,* 1 Cal.5th at p. 382.) We follow that convention.

may occur when an employer learns of misconduct and fails to discharge an agent or employee. [Citations.]" (*Id.* at p. 1111.)

Ratification is not itself a tort, but a doctrine that holds the ratifying party liable for the tort committed by another party. It is the voluntary election by a party to adopt, as its own, an act purportedly done on its behalf by another, the effect of which is to treat the act as originally authorized by the ratifier. (*Lebrun v. CBS Television Studios, Inc.* (2021) 68 Cal.App.5th 199, 208-209.) Ratification is not an element of a claim; it is a choice to adopt someone's act as one's own. Evidence of the ratification may come in many forms, for example where an employer fails to terminate, investigate, or respond to charges that an employee has committed an intentional tort. (*C.R. v. Tenet Healthcare Corp., supra,* 169 Cal.App.4th at pp. 1110-1111.)

B.     *The Claims in the First Cause of Action*

In its initial briefing, the Archdiocese argued only that the entire cause of action arose from protected speech. *Bonni* instructs that we should focus not on the essence or gravamen of the cause of action, but on each of the multiple claims within that cause of action. (*Bonni, supra,* 11 Cal.5th at p. 1011.) This does not alter the Archdiocese's argument; it continues to take the position that "the alleged basis for [the Archdiocese's] liability is the litigation activity that ratified the abuse." This position encompasses two arguments: first, that it is the ratification activity itself that is the focus of an anti-SLAPP motion; and, second, that the acts of ratification alleged by plaintiffs are defendants' litigation activity. Regardless of the validity of the first; the second is contrary to the actual allegations of the complaint.

25

Assuming without deciding that litigation activity allegedly evidencing ratification is a legitimate target of an anti-SLAPP motion, it was not properly targeted in this case. As *Bonni* explained, there is a difference between allegations that supply the elements of a claim and allegations of incidental background. (*Bonni, supra*, 11 Cal.5th at p. 1012.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra*, 1 Cal.5th at p. 394; *Pech v. Doniger, supra,* 75 Cal.App.5th at p. 459.)

The Archdiocese characterizes the first cause of action as based entirely on its litigation activity in the Roe litigation and the criminal investigation. This characterization of the complaint is not what the document actually says. Instead, the only allegations of ratification are based on unprotected conduct. We conclude that the allegations that might be considered protected activity are merely incidental.

We return to the allegations of the operative first amended complaint. The "Background Facts" section alleges the history of Father Cunningham's alleged sexual abuse of plaintiffs and any number of facts, which, if true, would have put the Archdiocese on notice that Father Cunningham may have been, or actually was, molesting young boys at his assignments. Specifically, from the time he was first ordained, and until he took a leave of absence after having been caught with a minor in a hotel room, Father Cunningham openly violated the written policies for prevention of child molestation by priests. This was known to other parish employees, and, in some cases, reported up the chain of command. As alleged, complaints went missing and were not investigated. Witnesses with information were never questioned. Time and time again, nothing was done to restrict or supervise

Father Cunningham's access to young boys. Instead, he was moved to different parishes and, ultimately, promoted to the position of priest at his own parish.

The "Child Sexual Abuse" cause of action incorporates the above by reference, then alleges, "Defendants are vicariously liable for the child sexual abuse committed upon Plaintiffs by Father Christopher Cunningham: 1) The Defendants authorized the wrongful conduct; 2) The Defendants ratified the wrongful conduct." Paragraph 108 follows, alleging, "For the reasons set forth in the incorporated paragraphs of this Complaint, the sexual abuse of Plaintiffs by Father Christopher Cunningham arose from, was incidental to Father Christopher Cunningham's employment with Defendants, and each of these Defendants ratified or approved of Father Christopher Cunningham's sexual abuse of minors, including Plaintiffs. Plaintiffs allege on information and belief that Defendants ratified and/or approved of the sexual misconduct by failing to adequately investigate, discharge, discipline or supervise Father Christopher Cunningham or other priests known by Defendants to have sexually abused children, or to have been accused of sexually abusing children. Defendants and each of them ratified Father Christopher Cunningham's abuse by concealing evidence of sexual abuse of other children by Father Christopher Cunningham and other priests from Plaintiffs, Plaintiffs' parents, other families with children, law enforcement, and personnel of Defendants who could have been in a position to prevent the abuse of Plaintiffs and others if they had known of complaints of Father Christopher Cunningham's sexual abuse of children, and prior complaints of other priests of sexual abuse of children." We observe that *none* of these allegations of ratification or approval

27

involves the Archdiocese's conduct in the Roe litigation or the criminal investigation.[13]

Similarly, paragraph 111 includes allegations of vicarious liability: "Defendants have routinely over the years failed to discipline, investigate or terminate known child molesting priests. Instead, Defendants condoned the conduct of priests molesting children by protecting offending clerics from public scorn and civil authorities, often transferring them from town to town, county to county, state to state, and country to country, all to allow child molesting priests to escape prosecution and protect their reputations, as well as the reputation of the Defendants. By doing so, Defendants have systematically encouraged and condoned this conduct by more priests, including Father Christopher Cunningham." We observe again that these specific allegations of "condon[ing]" abusive conduct by transferring priests to enable them to protect their reputations likewise make no mention of the Roe litigation or the Archdiocese's involvement in the criminal investigation of Father Cunningham.

To be sure, the complaint then alleges a number of paragraphs (112-115) that discuss the Archdiocese's continued financial support of Father Cunningham, and its defense of him in the Roe litigation and criminal investigation despite its knowledge of increasing numbers of victims making allegations of

---

[13] The allegation that the Archdioceses concealed evidence from "law enforcement," among others, cannot be interpreted as a reference to the criminal investigation. In context, the allegation refers to concealing evidence from individuals or entities who could have prevented the sexual abuse of plaintiffs and others. The criminal investigation of Father Cunningham did not commence until 2017, more than a decade after Father Cunningham took a leave of absence from the priesthood.

28

abuse against Father Cunningham.  Viewed as part of the full waterfront of the complaint's factual allegations that we have already described, these three paragraphs are a relatively small jetty.  Even more significantly, none of these paragraphs allege that, by its support of Father Cunningham in the Roe litigation and criminal investigation, the Archdiocese *ratified* Father Cunningham's sexual abuse of plaintiffs.  Unlike the specific paragraphs which allege "ratification," "approval," or even "condon[ing]" the sexual abuse by the Archdiocese's failure to investigate and supervise Father Cunningham, and instead transferring him to different locations, the allegations of the Archdiocese's litigation conduct set forth the facts, with no allegation that these facts establish vicarious liability.

For the purposes of the present appeal, we take the amended complaint at its word.  The claim for ratification is based on the allegations actually identified as ratifying.  The allegations of litigation conduct are simply incidental allegations that provide context, and are not the basis for any claim of ratification.

The Archdiocese, both in its anti-SLAPP motion before the trial court, and in its briefing on appeal, goes to great lengths to overlook the actual allegations of ratification, namely the acts of failing to investigate and supervise (and, instead, transferring to different parishes) of paragraphs 108 and 111, and instead argues that the entirety of the ratification allegations are found in the litigation conduct of paragraphs 112-115, despite the absence of ratification, approval, or similar terms in those paragraphs.[14]  In the course of doing so, the Archdiocese

_____

[14]     In its supplemental brief on remand, the Archdiocese argues, in a footnote:  "Plaintiffs never identify any other act by

mischaracterizes the complaint, cherry-picking allegations of litigation conduct, and, without support, suggesting that they are the only allegations incorporated by reference into the sexual abuse cause of action.[15]  As we have discussed, not only do these allegations not comprise the entirety of the allegations of ratification, they are, in fact, incidental to the actual allegations of ratification.[16]

Appellant [beyond the litigation activity] that is the basis for relief.  They merely make a passing reference that 'it is the alleged act of Defendants in authorizing and condoning Father Cunningham's sexual abuse of Plaintiffs that the claim is predicated.'  Authorizing and condoning are not acts but immaterial conclusions about motives and intent.  [Citations.]"  "Authorizing" is not a mere conclusion about intent, but a theory of liability.  A principal may be liable for the conduct of its agent, even if that conduct is criminal, in one of three ways:  (1) if the principal directly authorized it; (2) if the agent committed the tort in the scope of employment and in performing services on behalf of the principal; or (3) if the principal ratifies the conduct after the fact.  (*Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App.4th 953, 969.)

[15]     Specifically, the Archdiocese suggests that the cause of action is based on paragraphs 112-115 "and in the repeated and incorporated allegations [Paragraph 108] from Paragraphs 9-11, 61-64, 66-67."  Paragraphs 9-11, 61-64 and 66-67 are, in fact, earlier allegations of the same litigation conduct.  But there is nothing in the complaint which incorporates only those nine paragraphs by reference – either into the sexual abuse cause of action or the specific allegations of ratification.  Plaintiffs incorporated the entirety of their previous allegations (105 paragraphs) by reference.

30

### 3.    *Second Cause of Action - Negligence*

We next turn to plaintiffs' negligence cause of action.  The complaint alleged that a number of the plaintiffs had been students at parish schools.  We start with some basic rules about the legal duty owed to school children.[17]

---

[16]    The Archdiocese never argued that there were multiple claims for ratification, some based on protected litigation conduct and some not, and directed its anti-SLAPP motion only to those claims based on litigation conduct.  By putting all of its anti-SLAPP eggs in the litigation conduct basket, it failed to meet its burden as movant on this theory.  "If a cause of action contains multiple claims and a moving party fails to identify how the speech or conduct underlying some of those claims is protected activity, it will not carry its first-step burden as to those claims. [Citation.]  The nonmovant is not faced with the burden of having to make the moving party's case for it." (*Bonni, supra,* 11 Cal.5th at p. 1011.)  Here, the Archdiocese's notice of motion itemized a number of paragraphs to be stricken, but the vast bulk of those paragraphs were not addressed in its points and authorities at all.  While the Archdiocese did argue that the litigation conduct of paragraphs 112-115 was litigation activity, it failed to specifically move to strike only those paragraphs, because it argued the entirety of the cause of action arose from them.

[17]    In its supplemental brief on remand, the Archdiocese states that only one plaintiff, Doe 5, "claims abuse at a school."  The characterization of the complaint is incorrect.  For example, plaintiffs alleged that Father Cunningham "continued engaging in his sexualized conduct with [Doe 1] on the school and parish grounds."  In any event, the Archdiocese fails to explain, with argument and citation to authority, the relevance for this appeal of the actual site of the alleged molestation.

"Ample case authority establishes that school personnel owe students under their supervision a protective duty of ordinary care, for breach of which the school district may be held vicariously liable. [Citations.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 865.) Because of the special relationship a school district and its employees have with the students, the duty of care owed by school personnel includes "the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally." (*Id.* at pp. 869-870.) A "school district is liable 'for the negligence of supervisory or administrative personnel who knew, or should have known' of the foreseeable risk to students of sexual abuse by an employee and nevertheless hired, retained, and/or inadequately supervised that employee. [Citation.]" (*D.Z. v. Los Angeles Unified School Dist.* (2019) 35 Cal.App.5th 210, 223.)

This same special relationship exists between an archdiocese and its catechism students, and gives rise to the same duties. (*Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 671-673.) An archdiocese has a duty to take reasonable measures to protect its students from injuries at the hands of others while they attend catechism classes.[18] (*Id.* at p. 673.)

We consider the individual allegations of the negligence cause of action to which the Archdiocese directed its anti-SLAPP motion.

---

[18] The *Doe* court also held that the fact that the alleged assaults did not occur at the parish school did not undermine the existence of a special relationship, when the alleged assaults occurred on church property while the plaintiff was in the care and custody of the parish. (*Doe, supra,* 70 Cal.App.5th at p. 673.)

32

## A.    *The Archdiocese Mischaracterizes the Complaint*

Much like its attack on the first cause of action, the Archdiocese's strategy against the negligence cause of action was to construe it narrowly so as to limit its reach only to acts the Archdiocese claimed constituted protected speech.  We reject the attempt.

Prior to the complaint's section on "Background Facts," plaintiffs alleged, by way of introduction, that in 2018, the Archdiocese publicly apologized for child sexual abuse suffered at the hands of priests, and represented that the Church needed to be transparent about the perpetrators and vigilant in its investigations of allegations of misconduct.  The complaint goes on to suggest, however, that this public statement of concern was "very different from the way" the Archdiocese was actually treating victims of abuse.  Similarly, plaintiffs allege that the public statement of vigilant investigations was contradicted by the Archdiocese's actual practice of hiding evidence and denying abuse.

Focusing on this introductory language, the Archdiocese takes the position that the negligence cause of action "attempts to craft a negligence claim out of an alleged conflict between the Archdiocese's positive public statements about its response to accusations of abuse and alleged failures:  to inform parish communities and public authorities that Cunningham 'may have been' abusing minors, to publish Priests' policies to non-Priests and to inform staff about mandated reporters' duties."  By linking selected allegations of the negligence cause of action to the "positive public statements," the Archdiocese argues that the cause of action for negligence arises from its protected conduct in furtherance of speech.

33

We do not accept this selective reading of the first amended complaint. The negligence cause of action alleges, in successive paragraphs: (1) defendants had a duty to protect plaintiffs; (2) Father Cunningham was able to molest plaintiffs due to the access and authority he had as a priest; and (3) the Archdiocese knew or should have known of Father Cunningham's "dangerous and exploitive propensities and/or that Father Christopher Cunningham was an unfit agent." This is then followed by paragraph 120, which alleges, "Defendants breached their duty of care to the minor Plaintiffs by allowing Father Christopher Cunningham to come into contact with the minor Plaintiffs without supervision; by failing to adequately supervise, or negligently retaining Father Christopher Cunningham who they permitted and enabled to have access to Plaintiff[s]; by failing to investigate or otherwise confirm or deny such facts about Father Christopher Cunningham; by failing to tell or concealing from Plaintiffs, Plaintiffs' parents, guardians, or law enforcement officials that Father Christopher Cunningham was or may have been sexually abusing minors; and/or by holding out Father Christopher Cunningham to the Plaintiffs and their parents or guardians as being in good standing and trustworthy. As a Priest, Father Christopher Cunningham was expected to minister to parish families. Defendants acknowledged and expect that parish priests should visit parishioners' homes as part of their duties as priests. Father Christopher Cunningham visited family homes like Plaintiffs' as part of his expected functions. Defendants cloaked within the facade of normalcy Defendants' and/or Father Christopher Cunningham's contact and/or actions with the Plaintiffs and/or with other minors who were victims of Father Christopher Cunningham, and/or disguised the nature of the sexual abuse and contact."

34

The Archdiocese disposes of this paragraph by saying it "has a series of conclusory allegations strung together with an ineffable 'and/or.' That Paragraph is immaterial and cannot change the allegation that the activity giving rise to the claim for relief is protected 'failure to inform.' "

Even if those allegations were conclusory standing alone (a point we do not decide), they are reinforced by the specific allegations of fact in the preceding pages of the complaint. The numerous allegations of nonspeech-related negligent conduct – failure to supervise, negligent retention, failure to investigate – which form the bulk of this cause of action cannot be brushed aside because the Archdiocese would rather categorize this cause of action as "failure to inform."

The Archdiocese argues: "The only activity alleged here as the basis for the negligent supervision theory is that Defendants 'publicly purported' to implement a policy of informing 'parish communities' about accusations of abuse by a Priest but 'never informed' parish communities that Cunningham had been accused and failed to tell or concealed from 'Plaintiffs, Plaintiffs' parents, guardians, or law enforcement' that Cunningham 'was or may have been' abusing minors and/or holding out Cunningham as being in good standing and trustworthy. [Citations.] Everything else in Paragraph 120 is immaterial."

As with the first cause of action for the ratification of sexual abuse, the Archdiocese's characterization of the negligence cause of action attempts to read out of the complaint the allegations that are actually at its center. The "failure to supervise" allegation is not limited to failure to inform; as we shall discuss, it is questionable whether plaintiffs pursue a claim for failure to inform at all. But, even if failure to inform is pleaded as a theory of liability, the overall cause of action alleged

refers much more broadly to the Archdiocese's failure to supervise its employee who was molesting children. Plaintiffs specifically alleged that: (1) Father Gleason expressed concern that Father Cunningham was bringing boys into the rectory and warned Doe 3 "not to trust" Father Cunningham; (2) Father Miskella evaluated Father Cunningham as too immature to be a pastor and confidentially informed the Vicar for Clergy that he should speak with Father Gleason about Father Cunningham; but (3) the Vicar for Clergy did not do so; and (4) these and other red flags were ignored and Father Cunningham was moved from parish to parish, where he was free to continue molesting children unsupervised. The Archdiocese ignores these allegations in its effort to squeeze plaintiffs' negligence cause of action into something fitting its preferred contention regarding protected speech. "We need not, however, wear the blinders that appellants have fashioned for us." (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 630 (*Jespersen*).)

### B. *The* Bonni *Analysis*

Even though we conclude there is much more to the negligence cause of action than a "failure to inform," *Bonni* instructs that we must consider whether the Archdiocese has demonstrated that any of the individual negligence claims arise from protected speech.[19]

---

[19] We disagree with the Archdiocese's suggestion that we find protected activity in the complaint's introductory allegations that in 2018, the Archdiocese publicly apologized for child sexual abuse suffered at the hands of priests, and represented that the Church needed to be transparent about the perpetrators and vigilant in its investigations of allegations of misconduct. As *Bonni* explained, there is a difference between allegations that

36

In its briefing on the anti-SLAPP motion, the Archdiocese – whose interest is to characterize the negligence cause of action as including as many speech-related claims as possible – identified four negligence claims it asserts were based on protected speech: (1) failure to inform parish communities about allegations of abuse against Father Cunningham and instead holding him out as trustworthy; (2) failure to communicate the Archdiocese's policy for the prevention of molestation to nonpriest staff and members of the community; (3) failure to educate, train and warn plaintiffs about sexual abuse; and (4) failure to inform staff who were mandated reporters about their duties as mandated reporters under the law. The Archdiocese's assertion of anti-SLAPP-protected activity is doubly flawed.

> i. The Anti-SLAPP Statute's Definition of Protected Activity Does Not Encompass the Right Not to Speak Claimed by the Archdiocese Here

The four purported negligence claims identified by the Archdiocese have one key factor in common: they are all based on a decision not to speak, not speech itself. The Archdiocese

---

supply the elements of a claim and allegations of incidental background. (*Bonni, supra,* 11 Cal.5th at p. 1012.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra,* 1 Cal.5th at p. 394.) Plaintiffs seek no relief for the 2018 statements of the Archdiocese; these allegations are simply context for the later allegations of abuse, and therefore need not be stricken. (*Bonni,* at p. 1017 [allegations raised only as "window dressing" need not be stricken].)

argues, correctly, that the constitutional right to free speech has been held to encompass a right not to speak. (See, e.g., *West Virginia State Board of Education v. Barnette* (1943) 319 U.S. 624; *Beeman v. Anthem Prescription Management, LLC* (2013) 58 Cal.4th 329, 342 [the California Constitution's " 'right to freedom of speech, like the First Amendment's is implicated in speaking itself. Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say' "].) The right claimed by the Archdiocese in this case—a claimed right not to warn about known or suspected sexual abuse of minors (and to reveal and promote the policies in place to prevent it) is not akin to the right claimed in *Barnette*. This is important, for as we now explain, not every decision to refrain from speaking falls within the anti-SLAPP statute's definition of protected activity.

The anti-SLAPP law protects only speech and conduct that falls within one of four categories enumerated in Code of Civil Procedure section 425.16, subdivision (e): "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right

38

of petition or the constitutional right of free speech in connection with a public issue or issue of public interest."

A failure to speak cannot fall in any of the first three categories, which protect only "statement[s] or writing[s]," and not the failure to make them. If a failure to speak is protected at all, it must fall within the fourth category, as "other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or issue of public interest." Indeed, as there is no suggestion the failures to speak here related to the Archdiocese's right of petition, the issue is further narrowed. Specifically, does plaintiffs' complaint allege failures to speak which constitute "conduct in furtherance of the exercise . . . of the constitutional right of free speech in connection with a public issue or issue of public interest"?[20]

We conclude the failure to speak alleged as a basis for liability here is not conduct in furtherance of the right of free speech. (*Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 885-886 [failure to appear for interviews for a documentary film is not in furtherance of the right of speech]; *Jespersen*, *supra,* 114 Cal.App.4th at pp. 631-632 [attorneys who were sued for malpractice, not for "any act in

_____

[20] We assume without deciding that the Archdiocese could establish the "issue of public interest" element. (See *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547 [statements accusing church youth group leaders of an inappropriate relationship with a minor were communications that involved issues of public interest, specifically, "the societal interest in protecting a substantial number of children from predators . . . ."].)

furtherance of anyone's right of petition or free speech, but [their] negligent *failure* to do so on behalf of their clients" could not establish they were sued for protected speech]; see also *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1040-1041 [distinguishing *Digerati* in a case where there was not a complete failure to perform; partial acts done in support of an incomplete film can be said to have furthered the exercise of free speech rights].)[21]

The Archdiocese points to no allegations in the complaint of affirmative misrepresentations or concealment and no claims of partial speech.[22] They have therefore failed to identify a claim based on protected speech.

---

[21] *Suarez v. Trigg Laboratories, Inc.* (2016) 3 Cal.App.5th 118, 124 is not to the contrary. There, the court held that "[m]isrepesentation or failure to disclose can be protected petitioning activity for purposes of [Code of Civil Procedure] section 425.16." (*Ibid.*) In that case, the plaintiff alleged both an affirmative communication directing that a key document be hidden from him during a previous litigation and the defendants' subsequent silence with respect to the hidden document. (*Id.* at p. 123.) Thus, the court had before it both an affirmative misrepresentation and a failure to disclose, and was not required to analyze whether the latter alone was protected speech. To that end, the court distinguished *Jespersen,* in which the attorneys were sued for the negligent failure to act, stating, "This differs from the allegations of [defendant's] affirmative nondisclosure and concealment . . . ." (*Suarez.* at p. 125.) To the extent that *Suarez* stands for the proposition that the anti-SLAPP statute always applies to the failure to speak, we respectfully disagree.

[22] Although the Archdiocese relies heavily on its characterization of the negligence claims as being based on a failure to speak, it also notes that, in places, the plaintiffs alleged

ii. Allegations of Failure to Speak Are, in Any Event, Incidental to the Failure to Supervise in the Complaint as Alleged

In their supplemental briefing on remand, the plaintiffs argue that "an allegation regarding a failure to inform is not *itself* the basis for relief under the negligence claims alleged. Instead, it provides context to and evidence of the ultimate breach—the failure to prevent the underl[y]ing sexual assault." Plaintiffs argue that they are not seeking damages for any failure to speak standing alone, but for the sexual abuse that speaking might have prevented. As they explain, "the basis for Plaintiffs' negligence claim is not the failure to inform, but instead the failure to supervise its agent and its failure to protect Plaintiffs from foreseeable sexual abuse."

Given the allegations of plaintiffs' complaint, it is difficult to conceive of their allegations of "failure to warn" as supporting

_____

the Archdiocese "concealed" information about Father Cunningham and held him out as trustworthy. Paragraph 120 of the operative complaint does include both of these allegations. However, both are alleged in the alternative. That is, plaintiffs allege the Archdiocese breached is duty of care "by failing to tell or concealing" that Father Cunningham may have been abusing minors "and/or by holding out" Father Cunningham as being trustworthy. These allegations do not refer to any specific allegations of affirmative representations elsewhere in the complaint. That is, plaintiffs do not allege the Archdiocese made any actual statements to them regarding Father Cunningham being trustworthy. Viewed in context, we conclude these few allegations – pleaded in the alternative – of affirmative misconduct are, in fact, incidental allegations that can be disregarded for the purposes of anti-SLAPP. (*Baral, supra,* 1 Cal.5th at p. 394.)

41

a claim for relief independent of the claim based on negligent failure to supervise. In a case with similar allegations, the court explained, "On the negligent supervision and failure to warn claims, [plaintiff] will be required to show [the religious organization] knew or should have known of [the alleged abuser's] alleged misconduct and did not act in a reasonable manner when it allegedly recommended him to serve as [plaintiff's] Bible instructor. [Citations.] For each claim, [plaintiff] will also be required to prove the alleged sexual abuse occurred, causation, and compensatory damages. [Citation.]" (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 591.) In other words, in the present setting, there is no claim for failure to warn independent of the failure to supervise.

This is not a case where there are alternative theories of liability supported by a failure to, for example, repair property or warn of its unsafe condition. (See, e.g., CACI No. 1003 [failure to repair or warn of unsafe condition of property].) Plaintiffs do not posit a situation in which the Archdiocese could escape liability for failing to supervise a priest who was serially molesting minors by the simple expedient of warning them about him.[23] The allegations of failure to warn are only additional allegations of irresponsible conduct on the part of the Archdiocese, incidental to the claim of failure to supervise, and not subject to attack by an anti-SLAPP motion. (*Baral, supra,* 1 Cal.5th at p. 394.)

---

[23] In fact, plaintiffs allege that Father Gleason warned Doe 3 not to trust Father Cunningham, but this did not protect Doe 3 from Father Cunningham's abuse.

42

### 4.     *The Ruling on the Demurrer Is Not Before Us*

The Archdiocese argues that the trial court's ruling sustaining its demurrer with leave to amend is binding on our anti-SLAPP motion analysis.  Specifically, the Archdiocese suggests that the order was appealable and the plaintiffs' failure to cross-appeal the order renders it res judicata on the issue of whether their complaint stated a claim and the likelihood that plaintiffs will prevail on the merits under the second prong of the anti-SLAPP statute.  We disagree.

An order sustaining a demurrer with leave to amend is not a final judgment and is not otherwise itemized among appealable orders.  (Code Civ. Proc., § 904.1.)  The Archdiocese's argument is based on section 906, which provides, in pertinent part, "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party . . . ."

The Archdiocese argues that Code of Civil Procedure section 906 renders the demurrer ruling not merely reviewable, but *appealable* under *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719 (*Fontani*), disapproved on other grounds by *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, footnote 5.  Plaintiffs' failure to appeal the adverse ruling on demurrer, the argument continues, means that plaintiffs are stuck with an adverse ruling on the validity of their complaint.

In *Fontani*, the trial court denied an anti-SLAPP motion and overruled the bulk of a demurrer.  The defendant appealed and the Court of Appeal reversed the denial of the anti-SLAPP motion.  The defendant asked that the appellate court also

43

address the order overruling part of its demurrer under Code of Civil Procedure section 906.  The court declined on the basis that the demurrer ruling did not substantially affect the defendant's rights.  (*Fontani, supra,* 129 Cal.App.4th at p. 736.)  In the course of its discussion, however, the court stated, "Section 906 does allow for an appeal from an interlocutory order that involves the merits of, or necessarily affects, an anti-SLAPP order from which an appeal is taken.  In other words, where the propriety of an otherwise nonappealable order affects the validity of an anti-SLAPP order, an appeal will lie from the otherwise nonappealable order.  (See *City of Oakland v. Darbee* (1951) 102 Cal.App.2d 493, 504 [227 P.2d 909] [otherwise nonappealable order for separation reviewable on proper appeal from order for transfer because validity of order for transfer depended on validity of order for separation].)"  (*Ibid.*)  The dicta on which the Archdiocese relies is not, in our view, an accurate statement of the law.  The statute provides that, on appeal of an otherwise appealable order or judgment, the court may *review* any intermediate ruling which necessarily affects the order appealed from.  It does not render an otherwise nonappealable intermediate ruling *appealable*, and we disagree with any language in *Fontani* which suggests otherwise.[24]

---

[24]     The only case that *Fontani* cites in the passage quoted in the text, *Oakland, supra,* 102 Cal.App.2d 493, supports our conclusion.  There, the plaintiff had brought an eminent domain action against a number of defendants or groups of defendants, each of whom owned a different parcel of property the city sought to condemn.  One set of defendants successfully moved to separate the proceeding against them and transfer it to the county in which they resided.  The plaintiff appealed the appealable transfer order; but the separation order was not

44

Even under the reviewable rule, the demurrer ruling in our case is not reviewable. A second case cited by the Archdiocese, *Maranatha Corrections, LLC v. Department of Corrections and Rehabilitation* (2008) 158 Cal.App.4th 1075, 1084, illustrates why.

Unlike the present appeal, the order sustaining the demurrer in *Maranatha Corrections preceded* the order on the anti-SLAPP motion, so at least as a theoretical matter, the demurrer could have affected the subsequent anti-SLAPP ruling. Here, the ruling on the demurrer did not affect, and could not have affected, the order denying the anti-SLAPP motion: The order on the demurrer came *after* the court had already denied the anti-SLAPP motion.

## DISPOSITION

The order denying the anti-SLAPP motion is affirmed. The Archdiocese shall pay plaintiffs' costs on appeal.

RUBIN, P. J.

WE CONCUR:

BAKER, J.                    KIM, J.

---

appealable. The Court of Appeal concluded that the separation order could nonetheless be reviewed on appeal from the transfer order, as an intermediate ruling which necessarily affected the transfer order. (*Oakland*, at pp. 504-505.) The issue was one of reviewability, not *ab initio* appealability. The holding in *Oakland* does not suggest that plaintiffs here could have appealed the demurrer ruling or that the failure to do so had some binding effect on the anti-SLAPP motion.

45

Filed 6/15/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHARLES RATCLIFF, JR., et al. | B302558 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 19STCV20138) |
| v. | |
| THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES et al., | **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION** [There is no change in judgment] |
| Defendants and Appellants. | |

THE COURT:

The opinion in the above-entitled matter filed on May 19, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

It is further ordered, the opinion shall be modified as follows:

- On page 2, in the introductory paragraph, on line 6, replace the two words "and related" with "among other"; as modified, the sentence ends, " . . . among other acts and omissions."

- On page 3, delete the first sentence of the first full paragraph, and replace it with "At the time the trial court denied the anti-SLAPP motion, the court also sustained with leave to amend defendants' demurrer, on the grounds of lack of specificity."

- On page 4, in subheading A., delete the words "Allegations Concerning," and capitalize the "t" in "the"; as modified, the subheading begins, "The Archdiocese's Preexisting . . ."

- On page 9, in the first paragraph under subheading E., at the end of the fourth line, replace "of" with "for"; as modified, the phrase reads, ". . . policies and prohibitions for the prevention . . ."

- On page 16, in the final paragraph, in the sixth line, replace "Those allegations were:" with "As identified by the Archdiocese, those allegations were:"

- On page 17, add the following sentences to the end of footnote 7: "In *Baral*, the Supreme Court indicated that it sometimes used 'cause of action' to refer to a count as pleaded, while the proper subject of an anti-SLAPP motion is a 'claim.' (*Baral, supra,* 1 Cal.5th at p. 382.) We follow that convention."

- On page 18, in the first paragraph under subheading C., replace the first sentence with, "Plaintiffs' opposition to the motion argued that the speech and petitioning conduct identified in the Archdiocese's motion was merely supporting evidence of the Archdiocese's vicarious liability, and did not constitute the tortious acts on which the complaint was based."

- On page 21, in footnote 10, replace the final sentence of the footnote with, "The ruling on the demurrer is not before us on appeal, and, as we explain in Part 4 of our discussion, we express no opinion on it."

- On page 24, delete footnote 12, and renumber remaining footnotes.

- On page 25, in the paragraph under subheading B., four lines down; replace "each of the multiple claims" with "the individual claims presented"; as modified, the clause reads, "but on the individual claims presented within that cause of action."

- On page 26, in the second full paragraph, delete the last two sentences and replace them with, "Rather, a careful reading of the complaint reveals its allegations of ratification are based on unprotected conduct and any references to activity that might be considered protected under the anti-SLAPP statute are merely incidental, not a claim for recovery."

- On page 29, in the carryover paragraph, in the third line, delete "relatively"; as modified, the sentence ends, ". . . these three paragraphs are a small jetty."

- On page 38, in the carryover paragraph, beginning five lines from the bottom of the paragraph, replace the parenthetical clause with, "(and to refrain from revealing and promoting the policies in place to prevent it)".

- On page 41, in renumbered footnote 21 (carried over from page 40), five lines from the top, replace "is" with "its"; as modified, the sentence begins, "That is, plaintiffs allege the Archdiocese breached its duty of care . . ."

- On page 42, in the final paragraph, five lines from the bottom, replace "them" with "the minors"; as modified, the sentence ends, ". . . by the simple expedient of warning the minors about him."

There is no change in the judgment.

_____

RUBIN, P. J.          BAKER, J.                    KIM, J.

3